HADDON TOWNSHIP BOARD OF EDU-
CATION, Audubon Board of Education,
Riverton Board of Education, Plaintiffs,

v.

NEW JERSEY DEPARTMENT OF EDU-
CATION, United States Department of
Agriculture, Fred G. Burke, Commis-
sioner of Education of the State of New
Jersey and his successors in office, and
Robert Bergland, Secretary of the Unit-
ed States Department of Agriculture
and his successors in office, Defendants.

Civ. A. No. 78–2193.

United States District Court,
D. New Jersey.

July 18, 1979.

Steven A. Pardes, Sim, Sinn, Gunning & Fitzsimmons, P. A., Brick Town, N.J., for plaintiffs.

John J. Degnan, Atty. Gen., by Susan P. Gifis, Mark Schorr, Alfred E. Ramey, Jr., Deputy Attys. Gen., for defendants Fred G. Burke and New Jersey Dept. of Ed.

Robert J. Del Tufo, U.S. Atty., by Mary Catherine Cuff, Asst. U.S. Atty., Trenton, N.J., for defendants Robert Bergland and U.S. Dept. of Agriculture.

## OPINION

BROTMAN, District Judge.

This is an action by three local school boards to compel the United States Department of Agriculture and the New Jersey Department of Education to reimburse their schools under the National School Lunch Act for nutritionally adequate lunches provided by the schools but consumed by the students at their homes. Defendants contend they cannot subsidize the schools because the Act allows reimbursement only for lunches consumed on school grounds.

### I. Factual and Procedural Background

Plaintiffs are three local boards of education duly constituted under N.J.Stat. 18A:10–1 et seq. Each district is obligated under N.J.Stat. 18A:33–4 to provide lunch to all children enrolled in its district.[1] To

---

1. There is an exception for schools in which less than five percent of the pupils are eligible for specially subsidized lunches. The New Jersey School Lunch Act provides:

 18A:33–4. School lunch; availability to all children

 Each school district shall make school lunch available to all children enrolled in the district within 1 year from the effective date of this act. Such lunches shall meet minimum nutritional standards established by the Department of Education. Free and reduced price lunches shall be offered to all children qualifying under Statewide eligibility criteria.

 18A:33–5. Exemptions

comply with this mandate, plaintiff districts provide certain students with take-home bag lunches which may not be consumed on school premises but are taken by the students to their homes during a specified lunch period.

The district of the plaintiff Riverton School Board is one square mile in size with a single school situated in the center of the district. All students have always walked to and from school, and have always gone home for lunch. There are no funds budgeted to add a cafeteria or kitchen to the school, which was built around 1890. The take-home lunch program, in which meals are brought in from another kitchen, was initiated in September 1976 after parents indicated they wished their children to continue to come home for lunch as they always had done. Twice a year the District's Administrative Principal personally contacts the parents of children receiving free or reduced price lunches to insure that these children arrive home and consume the lunches themselves.

At the two elementary schools in the Audubon District, pupils have also traditionally gone home for lunch as the schools have no cafeteria or kitchen facilities. The students live no more than three-quarters of a mile from their schools. The take-home program began in January 1978.

The Haddon District began its take-home program in February 1977, and was in fact reimbursed by the Department of Education for seven months. Take-home lunches prepared elsewhere are provided for all children in four elementary schools; in the fifth elementary school about half of the children are allowed to remain in school to eat their noon meal since they are bussed in from a remote area of the township. No school has a cafeteria or kitchen, and students at the fifth school eat lunch in that building's multipurpose room.

Neither the state nor federal government contends that these take-home lunches fail to meet applicable nutrition standards.

Under the National School Lunch Act, 42 U.S.C. § 1751 et seq., federal financial assistance is given to states to help schools defray the costs of serving lunches to school pupils. States participating in the program enter into written agreements with the United States Department of Agriculture (USDA), and match each federal dollar with three state dollars. The states are funded by a formula which depends, in part, on the number of school children provided lunches. The combined funds are distributed by the states to local school boards. Children from needy families are eligible for free or reduced price lunches under the program.

Federal money is available for purchase of food service equipment. 42 U.S.C. § 1754. However, under USDA regulations, income from a lunch program may not be used to purchase land, construct new buildings or alter existing ones. 7 C.F.R. § 210.7(b) (1978).

While each plaintiff entered into agreements with the New Jersey Department of Education, which administers the School Lunch Act for the state, the Department has refused to reimburse the districts. It has also asked the Haddon Township Board to repay the state funds paid to the Board for lunches served between February and October 1977.

The Department's refusal to fund these districts is based on the USDA's position that take-home lunches do not qualify for subsidy under the Lunch Act. Apparently the Department believes USDA will not

---

Any school in which less than 5% of pupils enrolled meet the eligibility requirements for a free or reduced price lunch shall be exempt from the provisions of this act.

One of the plaintiffs here, Haddon Township, challenged the constitutionality of the five percent exemption in a prior suit. While the Superior Court of New Jersey, Chancery Division, and the Appellate Division held that the exemption denied school boards equal protection of the laws, the New Jersey Supreme Court upheld the statute. *Robbiani v. Burke*, 77 N.J. 383, 390 A.2d 1149 (1978). The State of New Jersey indicated at oral argument that if take-home lunches are inadequate under the National School Lunch Act, they might also fail to meet the mandate of the New Jersey Act. However, adherence to the New Jersey law is not at issue in this litigation.

match funds paid by the state for such lunches. The take-home concept first came to the attention of USDA officials informally in 1975. In June 1977 the state forwarded a description of the Riverton Board's program, with a supporting legal memorandum submitted by the Board, to the USDA regional director for New Jersey. The material was then forwarded to Washington.

By letter dated August 12, 1977, Lewis B. Straus, the Administrator of the Food and Nutrition Service, the USDA agency administering the Lunch Act, requested a legal opinion on the Riverton program from Sarah C. Weddington, USDA General Counsel. On December 7, 1977, John A. Harris, Assistant General Counsel, sent Straus a two-page opinion letter briefly analyzing the legal issue and concluding: "In our opinion, there is no authority in the National School Lunch Act for payment of claims for reimbursement for take-home lunches." This letter was forwarded to the USDA regional office on December 21, and apparently then brought to the attention of state officials.

Plaintiffs have sued the USDA, state Department of Education and the agencies' respective officers for monetary, declaratory and injunctive relief. Plaintiffs ask the court to hold that the School Lunch Act does not require in-school consumption of meals, that the two agencies cannot so require, and accordingly to order the state to reimburse the plaintiffs for meals previously served and those which will be served in the future.

■ Jurisdiction is asserted under 28 U.S.C. § 1331 because of the presence of questions of federal statutory interpretation.[2] Plaintiffs' cause of action against the USDA and Secretary Bergland is based on review of final agency action under § 10(a) of the Administrative Procedure Act (APA), 5 U.S.C. § 702. The cause of action against the Department of Education and Commissioner Burke is based on common law breach of the written agreements between the state and school boards, and also their failure to adhere to the terms of the Act.

As no material facts are at issue, all parties have moved for summary judgment, Fed.R.Civ.P. 56. Defendants' primary argument is that the School Lunch Act prohibits reimbursement for take-home meals. Plaintiffs contend that the Act requires funding of such meals. Alternatively, the school boards argue that § 4 of the APA, 5 U.S.C. § 553, required the federal agency to provide notice of the proposed rule in the Federal Register and an opportunity for interested persons to comment, and that the agency failed to follow these rulemaking procedures before the December 1977 opinion letter was issued. Defendants counter that this ruling was interpretative, and therefore exempt from the § 553 requirements. See § 553(b)(A).

The federal defendants also contend that the agency decision is not ripe for review, and the state defendants further argue, in a motion to dismiss, Fed.R.Civ.P. 12(h)(3), that plaintiffs have failed to meet the $10,000 jurisdictional amount. The court will first consider the jurisdiction and ripeness issues before turning to the questions of agency procedure and statutory interpretation.

2. Following oral argument of these motions, the federal defendants submitted a brief in which they argue that this court has no jurisdiction because the essence of this claim is for money damages over $10,000, and that exclusive jurisdiction over such a suit is in the Court of Claims. At the time of argument, the court granted leave to plaintiffs to amend their complaint to allege jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2). Plaintiffs have failed or declined to so amend. Since the complaint rests solely upon the APA, which waives sovereign immunity only for relief other than money damages, there can be no claim for money damages against the United States or its officers. 5 U.S.C. § 702; *Jaffee v. United States*, 592 F.2d 712, 718–19 (3rd Cir.), cert. denied, —— U.S. ——, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Therefore, defendants' argument is moot and the court has jurisdiction to decide the case. For the same reason, and because of the decision for defendants on the merits, the court need not reach the federal defendants' contention that the School Lunch Act does not provide a right to monetary recovery.

## II. Subject Matter Jurisdiction over State Defendants

■ The state defendants, noting that the complaint fails to allege jurisdictional amount, maintain that the suit against them must be dismissed for lack of subject matter jurisdiction. Under a 1976 amendment to 28 U.S.C. § 1331(a), the $10,000 jurisdictional amount is no longer required for actions brought against an agency of the United States or an officer thereof. Pub.L. No. 94–574, § 2, 90 Stat. 2721 (1976). But jurisdictional amount is still required for claims against state officials and agencies.

■ Plaintiffs have not sought to amend their complaint to allege a jurisdictional amount, nor is there evidence in the record conclusively demonstrating that more than $10,000 is at stake for each plaintiff. However, the complaint will not be dismissed for failure to plead amount in controversy, *Schlesinger v. Councilman*, 420 U.S. 738, 744 n. 9, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), because the court finds that the claims against the state can be heard under the doctrine of pendent party jurisdiction.

■ The doctrine of pendent jurisdiction allows a federal court to hear a claim lacking an independent jurisdictional basis where it is brought in conjunction with a significant claim that is properly based, and the two claims "derive from a common nucleus of operative fact" and "are such that [a court] . . . would ordinarily be expected to try them . . . in one judicial proceeding . . . ." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The instant litigation clearly meets this test.

The *Gibbs* court was concerned with constitutional power[3] to hear a pendent claim between the same parties. But in a more recent case involving an additional claim against an additional party—a pendent party—the Supreme Court held that even where there is constitutional power to hear the additional claim, a trial court must also determine that the pendent party claim is within the statutory jurisdiction of the court. *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

In *Aldinger*, the plaintiff asserted a claim based on 42 U.S.C. § 1983, with jurisdiction pursuant to 28 U.S.C. § 1343(3), against county officials. She also asserted a similar claim against the county itself, which was wholly grounded on state law as the county could not be sued under § 1983.[4] The Court held that even if the *Gibbs* test could be met, pendent jurisdiction over the county would be beyond the statutory grant of § 1343(3). *See also Owen Equipment and Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

While declining to extend jurisdiction in the case before it, the Court limited its holding:

> There are, of course, many variations in the language which Congress has employed to confer jurisdiction upon the federal courts, and we decide here only the issue of so-called "pendent party" jurisdiction with respect to a claim brought under §§ 1343(3) and 1983. Other statutory grants and other alignments of parties and claims might call for a different result. When the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346, the argument of judicial economy and convenience can by coupled with the additional argument that *only* in a federal court may all of the claims be tried together. 427 U.S. at 18, 96 S.Ct. at 2422.

---

3. In this case there would be constitutional power to hear the claim against the state defendants regardless of the pendent doctrine since Article III, § 2 of the Constitution does not impose a jurisdictional amount requirement; that limitation is strictly statutory. *Jacobson v. Atlantic City Hospital*, 392 F.2d 149, 153 (3rd Cir. 1968).

4. The Supreme Court subsequently overruled previous cases and has allowed counties and other state entities to be sued under § 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ The case *sub judice* is indeed closer to the tort claims example than to the situation presented in *Aldinger*. The claim against the federal defendants could not be brought in state court as the APA's waiver of sovereign immunity applies only to actions brought in federal courts. 5 U.S.C. § 702.

The legislative history of the 1976 amendment to § 1331, allowing suits against the federal government for less than $10,000, indicates that pendant party jurisdiction in this case would be consistent with the intent of the statute. The House Report accompanying S. 800, which became Pub.L. No.94–574, states:

> The factors relevant to the question whether a Federal court should be available to a litigant seeking protection of a Federal right have little, if any, correlation with the minimum jurisdictional amount.

> Thus, as Assistant Attorney General Scalia in his comment in behalf of the Justice Department concluded:

> . . . the existence of monetary damages in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved . . . the "amount in controversy" provision of section 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action.

H.R.Rep. No. 94–1656, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.Code Cong. & Admin.News, pp. 6121, 6135.

■ This statement indicates that the amendment was intended to extend a federal forum to cases where a non-federal defendant is needed to fully adjudicate the consequences of federal agency action. This would be particularly appropriate where, as here, the claim against the non-federal party presents similar federal questions.[5] This result is further supported by § 3 of Pub.L. No. 94–574, which amended 28 U.S.C. § 1391(e) to provide venue in a single district for a suit against both federal officials and private parties. It would appear that "Congress wanted to grant this sort of jurisdiction to federal courts." *Aldinger*, 427 U.S. at 17, 96 S.Ct. at 2421.

In an analogous case, Judge Coolahan of this district found that Congress' grant of admiralty jurisdiction, 28 U.S.C. § 1333(1), extended to pendent party state law claims involving the same nucleus of fact. He noted that since admiralty jurisdiction is exclusively in federal court, only in that forum could all claims be tried together. *Morse Electro Products Corp. v. S. S. Great Peace*, 437 F.Supp. 474, 485 (D.N.J.1977).

This court is also guided by two cases decided before *Aldinger* but involving similar facts as the instant case. In *Jacobson v. Atlantic City Hospital*, 392 F.2d 149 (3rd Cir. 1968), the Court of Appeals allowed a plaintiff to join his diversity claims against three defendants in one action though one claim did not involve more than $10,000, as required by 28 U.S.C. § 1332(a).

Of particular relevance is the case of *Almenares v. Wyman*, 453 F.2d 1075 (2nd Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). There plaintiffs sued state and local officials alleging that welfare termination procedures violated the due process clause and federal regulations. The damages sought

---

**5.** The state has indicated it has followed USDA's interpretation of the National School Lunch Act in its administration of funds to local boards, and will comply with any modification in USDA rules imposed by the courts. The complaint charges that the state's actions violate the Act, thus stating a federal question. *See PAAC v. Rizzo*, 502 F.2d 306, 312 (3rd Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). While the court does not determine if the Act creates a private cause of action against a state agency (or the federal government), plaintiffs' claim for damages and prospective funding is also based on enforcement of its contracts with the Department of Education under state common law. However, this " 'state created' claim itself presents a 'pivotal question of federal law' . . . because an act of Congress must be construed," so that a federal question is presented. *Warrington Sewer Co. v. Tracy*, 463 F.2d 771, 772 (3rd Cir. 1972). *Accord, Lindy v. Lynn*, 501 F.2d 1367, 1368 (3rd Cir. 1974).

by each plaintiff did not exceed $10,000. However, the constitutional claim, asserted against the state official only, could be brought under 28 U.S.C. § 1343(3), and the plaintiffs relied on pendent party jurisdiction to assert the claim of breach of federal regulations against the local official. Judge Friendly, writing for the panel, indicated that § 1343(3) vested the court with authority over the pendent as well as the constitutional claim.

In his treatise, Professor Moore states that *Almenares* is still "eminently sound" after the *Aldinger* case. 3A J. Moore, Federal Practice ¶ 20.07[5.–1] at 20–80 (1978). He adds that a congressional intention to force plaintiffs to split claims based on federal law between state and federal courts because of jurisdictional amount problems "should not be lightly supposed. . . ." *Id.*

■ The court concludes that § 1331(a) grants authority to a federal court to hear a claim against a non-federal defendant that fails to meet the $10,000 jurisdictional amount, where that claim is pendent to a claim against a federal agency, and both claims involve federal law issues. Having determined there is authority to hear the pendent claim, the court must also decide whether to exercise its discretion to do so. *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. Use of pendent jurisdiction here is surely reasonable since only federal law issues are involved, and this is the only forum where both sets of defendants can be sued. Pendent party jurisdiction will be exercised over the claim against the state defendants, and their motion to dismiss is denied.[6]

6. The New Jersey defendants have also moved for dismissal on the basis that the claim is barred by the eleventh amendment. Certainly this suit cannot be brought against the state itself or its agency, and the Department may be dismissed on that ground; but the Commissioner may be sued. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). While conceding that he could be subject to a prospective injunction, defendant Burke contends that he may not be held liable for retroactive damages for lunches previously served, citing *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662

## III. Ripeness for Review

■ The federal defendants contend that this case is not ripe for judicial review, and should therefore be dismissed without consideration of the substantive issues.[7] They argue that the General Counsel's letter is simply an advisory opinion by a subordinate agency official, and that USDA never sought reimbursement from the state for those lunches which the state initially paid the Haddon school board, nor otherwise specifically refused to fund take-home lunches.

■ The criteria for determining ripeness were established in the case of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The reviewing court must examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515. The fitness criterion encompasses two inquiries: whether the case presents a crystalized legal question suitable for judicial resolution, and whether the ruling is a "final agency action" within the meaning of § 10(c) of the APA, 5 U.S.C. § 704. *Ibid.*

The issues here are certainly fit for judicial decision. The primary questions involve statutory interpretation of the School Lunch Act and the APA. *See A. O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515, 521 (3rd Cir. 1976). There are no facts in dispute, and the court need only consider the law and legislative history. *See National Automatic Laundry and Cleaning Council v. Schultz*, 143 U.S.App.

(1974). There is also an intriguing question whether *Edelman* would allow the court to enjoin the commissioner from attempting, in the future, to collect the disputed overpayment previously made to the Haddon School Board in 1977. However, given the court's disposition in favor of defendants on the substantive issues, the question of what relief could be awarded need not be reached.

7. There is no dispute that the plaintiffs have standing to seek review of USDA's determination. *See, e. g., Michigan Head Start Directors Ass'n v. Butz*, 397 F.Supp. 1124, 1131 (W.D. Mich.1975).

D.C. 274, 443 F.2d 689, 695 (1971). Unlike the case of *New York Stock Exchange v. Bloom*, 183 U.S.App.D.C 217, 562 F.2d 736 (1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978), which found an issue unfit, there is no need to present the agency with further evidence. *See* 562 F.2d at 741. Here the General Counsel, once familiar with the simple factual premise of the Riverton program, based his decision entirely on the statute and its regulations.

The court also believes that USDA's letter constituted final agency action. The finality concept was further refined by the Supreme Court in the case *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). The Court stated that "the relevant considerations . . are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the action." 400 U.S. at 71, 91 S.Ct. at 209.

There is no contention that a court determination now will disrupt the federal administrative process; indeed USDA concedes that plaintiffs have no avenue of review of the General Counsel's determination. While the federal government has not made any specific denial of reimbursements to the state under the Act as a consequence of its determination, as long as the state continues to deny reimbursement to the school boards based on the USDA opinion letter, the question of federal funding of take-home lunches will never be directly faced by the Department of Agriculture. The agency did, in theory, match the state monies paid to Haddon Township for the first seven months of its program, but there is nothing in the record to indicate that USDA knew that its monies were used in that way.

The General Counsel's opinion letter, however, was directly addressed to the situation at Riverton. Although USDA has never specifically threatened to deny federal monies or take any other sanction against New Jersey if it were to pay for take-home lunches, federal officials are aware, if only because of this litigation, that New Jersey is following the federal agency's interpretation of the law and has refused reimbursement for take-home lunches. USDA regulations state:

FNS [Food and Nutrition Service] may terminate a State agency's participation in the Program in whole, or in part, whenever it is determined that the State agency has failed to comply with the conditions of the Program . . .. A state agency . . . shall terminate a school's participation in the Program by written notice whenever it is determined by FNS or the State agency that the school has failed to comply with the conditions of the Program. When participation in the Program has been terminated for cause, any payments made to the State agency or a school or any recoveries by FNS from the State agency or school shall be in accordance with the legal rights and liabilities of the parties. 7 C.F.R. § 210.19(a)(2) (1978).

Regulations also prohibit school boards from joining the program unless they have the "necessary facilities for . . . serving food." 7 C.F.R. § 210.8(e)(12) (1978). The court concludes that the rights of plaintiffs have effectively been determined by the opinion letter; legal consequences may not flow directly from the USDA ruling, but the indirect result is certain.

The informal nature of the letter opinion does not preclude the required finality. In *National Automatic Laundry* the court held that an opinion stated in a letter of the agency administrator presented a ruling ripe for review. It was noted that the agency decision was neither based on a hypothetical situation, nor subject to certain reconsideration. 443 F.2d at 699–701. Similarly, here the USDA ruling was based on the existence of the Riverton program and, as was indicated previously, there is no further review of the letter within the agency. The major decision in this circuit holding a ruling unripe, *West Penn Power Co. v. Train*, 522 F.2d 302 (3rd Cir. 1975), *cert.*

*denied*, 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976), can be distinguished on this basis. In *West Penn* the Court of Appeals found that a notice of violation of environmental standards was not final agency action because it only preceded enforcement procedures, which were at the discretion of the agency administrator. 522 F.2d at 310–11.

The court also finds a letter from the USDA General Counsel sufficiently authoritative to be final agency action. In *National Automatic Laundry* the court found that a letter from the Administrator of the Wage and Hour Division of the Department of Labor constituted a final ruling. In the case here the Administrator of the Food and Nutrition Service did not issue the letter; rather, he specifically requested a ruling from the Office of General Counsel for the entire Department. The response is signed by an assistant general counsel, and not the General Counsel, Ms. Weddington. However, the government has indicated the letter will not be reviewed within the Department and that the agency stands by its conclusion. Therefore the letter must be taken as sufficiently authoritative for judicial review.

The General Counsel's ruling has the requisite finality, and the legal conclusion therein is quite fit for judicial review. The ruling also meets the second major criterion of *Abbott Laboratories* as denial of judicial review would work a hardship on all plaintiffs. USDA has indicated it will not make any further determinations based on the Haddon or Audubon programs, which present the identical question posed by the Riverton program. Thus, the three plaintiffs have no other legal redress as long as the state chooses to follow the USDA's ruling. They must either forgo state and federal money by continuing the take-home program, or take the costly step of building cafeteria facilities to adhere to what they believe to be an incorrect policy. The impact of the USDA ruling is "direct and immediate," compliance is expensive and noncompliance engenders serious penalties. *See Abbott Laboratories*, 387 U.S. at 152–54, 87 S.Ct. 1507.

The Supreme Court's ripeness criteria are fully satisfied here. USDA's ruling is ripe for judicial review of its procedure and substance, to which the court now turns.

## IV. USDA Procedures

Plaintiffs' primary argument is that the School Lunch Act mandates reimbursement for nutritionally adequate lunches provided by the school no matter where they are consumed, and that defendants' actions therefore violate the statute. In the alternative plaintiffs maintain that the USDA ruling was illegally issued and is invalid regardless of the Act's specific mandate.

The school boards challenge USDA's procedures for failure to provide notice in the Federal Register and opportunity for interested persons to comment, as required for all substantive rulings by § 4 of the APA, 5 U.S.C. § 553. Defendants believe these procedures were not required because the ruling was interpretative rather than substantive and therefore exempted from the § 553 requirements. *See* § 553(b)(A).[8]

---

**8.** 5 U.S.C. § 553 provides:

§ 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

As the Supreme Court recently stated, "[t]he central distinction among agency regulations found in the . . . (APA) is that between 'substantive rules' on the one hand and 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice' on the other." *Chrysler Corp. v. Brown*, 44 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979). The basic differences between substantive and interpretative rule were summarized in *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977):

> Legislative, or substantive, regulations are issued by an agency pursuant to statutory authority and . . . implement the statute . . . . Such rules have the force and effect of law. . . . By way of contrast, a court is not required to give effect to an interpretative regulation.

*Accord, Chrysler Corp. v. Brown*, 99 S.Ct. at 1718.

■ An interpretative rule is simply the agency's opinion of the meaning of a statute. It does not bind a reviewing court, which must examine the interpretation just as it would approach any other question of law, although a certain deference is given the agency's expertise. On the other hand, substantive rules are more than a mere interpretation of the statute. They represent creation of new law based on a delegation of authority to the agency by Congress. Since these rules have the "force of law," they may be overturned by a review-

ing court only if the agency acted arbitrarily or capriciously or went beyond its authority in promulgating them. 5 U.S.C. § 706(2). *Batterton v. Francis*, 432 U.S. at 426, 97 S.Ct. 2399; *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1257–58 & n. 18 (3rd Cir. 1978). *See generally* 1 K. Davis, Administrative Law Treatise § 5.03 (1958 & Supps. 1970, 1976).

■ Substantive rules will not carry the force of law, though, unless they are promulgated pursuant to the procedural requirements of the APA. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 99 S.Ct. at 1723, 1725. The exclusion of interpretative rules from these procedural requirements reflects the sensible notion that there is little need for public comment where the agency is simply providing its legal interpretation of the meaning of an enabling statute, an interpretation which is fully reviewable in the courts.

To determine whether a rule is substantive or interpretative, the federal courts have used various tests. In *Chrysler Corp. v. Brown*, the Court noted that a substantive rule is one "affecting individual rights and obligations." 99 S.Ct. at 1718, *quoting Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). This criterion has been employed by some courts, which have focused on whether the rule had "sub-

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing,

sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

stantial effect" or "substantial impact." E.g., *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2nd Cir. 1972); *Lewis v. Weinberger*, 415 F.Supp. 652, 661 (D.N.M. 1976); *Hou Ching Chow v. Attorney General*, 362 F.Supp. 1288, 1292 (D.D.C.1973); *Continental Oil Co. v. Burns*, 317 F.Supp. 194, 197 (D.Del.1970).

However, while this characteristic may be required of a substantive rule, it does not always distinguish an interpretative rule. It is clear that interpretations of a statute often significantly affect an individual's rights.[9] In the instant case, the USDA ruling has certainly affected the rights of the plaintiffs, but this does not assist the court in determining if the rule is substantive or interpretative.

Another test is also stressed in *Chrysler Corp. v. Brown*. A rule may not be substantive, and assume the force of law, unless it is promulgated pursuant to a congressional delegation of authority. Even if a rule goes beyond a mere definition of statutory provisions, without a delegation of power it is necessarily interpretative. *Joseph v. United States Civil Service Commission*, 180 U.S.App.D.C. 281, 294 n. 24, 554 F.2d 1140, 1153 n. 24 (1977); K. Davis, *supra*, § 5.03 at 147 (Supp.1976).

Congress has delegated rulemaking authority to the Secretary of Agriculture. Section 1779 of Title 42 provides: "The Secretary shall prescribe such regulations as he may deem necessary to carry out this chapter [the Child Nutrition Act] and the National School Lunch Act . . . ." That the general subject matter of USDA's ruling on take-home lunches is within this broad delegation is confirmed by the provision's legislative history. The House Report accompanying the 1970 law that amended § 1779 to refer to the School Lunch Act, in addition to the Child Nutrition Act, states:

> The . . . provision provides flexibility to the Department and to the States

as they move toward providing a fully adequate food service for children. The needs of States vary, some need equipment for urban center operations before they can begin a full-scale food service program, others with fully equipped schools need money for free or reduced price meals.

H.R.Rep. No. 91–81, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S.Code Cong. & Admin. News, pp. 3014, 3016, *accompanying* H.R. 515, § 7(b), enacted as Pub.L. No. 91–248, § 8, 84 Stat. 212 (1970).

While this grant of legislative rulemaking authority could conceivably cover a ruling on the take-home issue, neither the delegation section itself, nor its legislative history, conclusively demonstrates that Congress specifically intended to allow the Secretary to determine whether take-home meals are funded. The existence of broad rulemaking authority does not alone indicate whether the ruling is substantive because the delegation provision here is vague.

The court believes that it must look beyond the delegation section of the statute to the general enabling provisions of the Act, those sections which grant USDA its administrative authority to operate the program, to find a more specific legislative intent. Only by examining the mandate of the entire Act can the court determine what issues Congress intended to be resolved by rulemaking. The delegation provision must be read consistently with the general enabling provisions so that the statute is construed as a cohesive whole. Either the enabling provisions are silent on take-home lunches and leave that determination to the Secretary under his delegated authority, or they imply a definite position on the take-home question and necessarily precludes the use of delegated authority to determine the issue. That implied statutory position may be either disapproval of funds for take-home lunches, or specific approval of subsidies for such a program.[10]

---

9. This guideline may be helpful in distinguishing rules of agency organization, procedure or practice within the meaning of § 553. *See, e. g., Pickus v. United States Board of Parole*, 165

U.S.App.D.C. 284, 295–96, 507 F.2d 1107, 1112–13 (1974).

10. A conceivable fourth construction is that neither the enabling nor delegation provisions

Accordingly, the court must construe the statute not only to determine if it specifically approves or disapproves the take-home program, but also to decide if, instead, the statute leaves resolution of the issue to the Secretary's delegated power to make legislative rules by way of § 553 procedures because the general enabling provisions do not speak directly to the issue. In other words, the only method for resolving whether USDA's ruling is substantive or interpretative is to discover the mandate of the statute on the issue presented; the questions of agency procedure and statutory interpretation must be answered together.

This approach fits well within the APA's scheme for judicial review. Regardless of whether the agency action is an interpretative ruling provided by an agency official, or a substantive rule made after elaborate notice and comment procedures, § 10(e) of the APA, 5 U.S.C. § 706, provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions . . . ." The court may set aside an action where it is "not in accordance with law," or "in excess of statutory jurisdiction." § 706(2)(A), (C). The statutory mandate is paramount in any event.

A third test employed by some courts is to simply consider the label the agency gives the ruling. This criterion was recently recognized by the Third Circuit Court of Appeals, *Daughters of Miriam Center*, 590 F.2d at 1255–56 n. 9, and has been deemed a prime consideration by Professor Davis. K.

Davis, *supra*, § 5.03 at 148 (Supp.1976). USDA labels its opinion letter interpretative. This court defers to that characterization in the sense that the question will be examined as one of statutory interpretation. However, if it is found that authority for barring take-home lunch subsides can only be derived from the delegation provision of the statute, then the opinion letter will be invalidated as an improper interpretation, and the case will be remanded to the agency which could then choose to conduct rulemaking procedures to reconcile the status of take-home programs.

V. Interpretation of the Statute

A. Deference to Agency

 While an agency's interpretation of a statute does not bind the courts, it is entitled to some deference.[11] "It is a settled principle of administrative law that the courts give considerable deference to the construction of statutes by those agencies charged with the primary responsibility for their enforcement." *Consolidated Express, Inc. v. New York Shipping Association, Inc.*, 602 F.2d 494 at 504 (3rd Cir. 1979).

 The Supreme Court's most comprehensive statement on the deference afforded agency interpretative rulings is found in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944):

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do

speak to the take-home lunch problem. But this outcome is easily eliminated here because the delegation to the Secretary is rather open-ended, and, by its history, appears to cover this general area. In another case, where the delegation is narrow and found not to cover the problem, a reviewing court would likely feel forced to infer a specific position from the enabling provisions, so that this fourth hypothetical construction would be avoided.

11. This deference is usually recognized in cases involving an agency's interpretative ruling on the meaning of enabling provisions of a statute, which is the form of ruling by USDA ultimately

upheld here. But it should be noted that the same deference is also paid an agency's interpretation of a statute's provision delegating substantive rulemaking authority. *See Batterton v. Francis*, 432 U.S. at 424–26, 97 S.Ct. 2399; *Baltimore and Ohio Chicago Terminal Railroad Co. v. United States*, 583 F.2d 678, 683 (3rd Cir. 1978), *cert. denied*, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). A holding that an agency rule is properly within the agency's statutory authority to promulgate regulations would necessitate a further holding that the rule does not contravene any enabling provisions of the same statute since all provisions must be read together consistently.

constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. Accord, *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). The *Gilbert* Court indicated that greater authority should be given interpretations which are made contemporaneously with the enactment of a law. 429 U.S. at 142, 97 S.Ct. 401. Special credence is also given long-standing interpretations. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). A court should also consider the nature of the agency's expertise. *Batterton v. Francis*, 432 U.S. at 425 n. 9, 97 S.Ct. 2399.

USDA is the agency charged with the primary responsibility for the Act. The place where subsidized lunches are consumed is an integral part of the overall scheme of the program, and therefore subject to the Administrator's expertise. Interpretation of the provisions of the Act is within the expertise of the USDA General Counsel. These factors indicate that considerable deference should be given USDA's interpretation.

On the other hand, there is nothing in the record to show that the Department has taken this position or even considered this issue before the Riverton situation arose. Therefore the agency ruling cannot have the authority of a contemporaneous or long-standing pronouncement, although it should also be noted that it is not inconsistent with any prior administrative construction or practice.

In addition, it appears that the interpretation advanced in the opinion letter was not thoroughly considered by agency offi-

cials. The federal defendants' own supplemental brief states at page 3 that the General Counsel's opinion "has not been the subject of authoritative reconsideration" and "is, at best, a cursory review of the statute." Indeed, little analysis is provided in the two-page document. Accordingly, while the subject matter of this opinion should entitle it to great weight, the nature of the interpretation dictates that the opinion be given a more limited, yet still significant, degree of deference.

## B. The Language of the Act

Turning at last to the precise mandate of the Act, its language is, of course, the primary consideration.[12] Defendants support their position by citing various sections of the Act. Section 4 of the Act, 42 U.S.C. § 1753, refers to "lunches . . . *served during such fiscal year to children in schools in such State* . . . ."; § 8 of the Act, 42 U.S.C. § 1757, refers to "lunches *served in the school* . . . ."; and § 11, 42 U.S.C. § 1759a, refers to "children eligible for such reduced-price lunches *in schools* . . . ." (emphasis added). Defendants argue that the phrase "served in school" can only mean lunches both provided and consumed on the premises.

"Serve" means "help persons to food: as . . . to set out portions of food and drink." Webster's Third New International Dictionary 2075 (Unabridged ed. 1971). The statutory language, on its face, can only be construed to indicate that food must be *provided* inside the school. Undue emphasis on the "in school" language is also rebutted by § 9 of the Act, 42 U.S.C. § 1758, which refers to lunches "served *by* schools . . . ." (emphasis added). The court concludes that the cited language provides no specific mandate on the take-home issue.

Plaintiffs urge that this lack of specificity supports their position. They recite the maxim "*expressio unius est exclusio alteri-*

---

12. Since the USDA ruling can be upheld on the basis of the statute itself, the court need not reach the agency's arguments that its regula-tions implicitly require lunches to be eaten in the school.

*us* [13] at page 10 of their brief, contending that the failure of Congress to include a specific mandate for in-school lunches indicates a legislative intent to subsidize both in-school and take-home programs. However, this is not persuasive since the Act is generally vague on the requirements for participation by schools, leaving such decisions to USDA and the state agencies.

C. Policy Implications

Both sides also contend that the policies implicit in different provisions of the Act support their position. Defendants first argue that § 5 of the Act, 42 U.S.C. § 1754, and § 5 of the Child Nutrition Act, 42 U.S.C. § 1774, which mandate that for both programs funds be made available to schools to buy food service equipment, and that certain special funds be used only for facilities to serve hot meals unless exception is made, § 1774(f)(1), imply a desire by Congress that all meals be consumed on the premises. Certainly hot meals cannot be taken home, and Congress intended to encourage hot lunches, but an explicit exception was made for cold lunch programs which could possibly include take-home meals.

Defendants next refer to § 9(b)(1) of the Act, 42 U.S.C. § 1758(b)(1), which states: "No physical segregation of or other discrimination against any child eligible for a free lunch or reduced price lunch shall be made by the school . . . ." While this provision undoubtedly refers to segregation of pupils eating in a school cafeteria, it would also prohibit segregation of children as they are given bag lunches, and, in any case is too remote from the question at hand to be construed to require on-premises consumption.

Defendants also point to § 9(a), 42 U.S.C. § 1758(a), which states: "The Secretary shall establish, in cooperation with State educational agencies, administrative procedures . . . designed to diminish waste of foods . . . ." Teacher supervision of school cafeterias may help prevent waste, and a take-home program does present the potential for children losing or giving food to others outside the school. But there is nothing in the record to indicate that USDA seriously examined these factors or considered if take-home lunches would in fact reduce waste because children could store uneaten foods in their home refrigerators for later consumption. Indeed there is nothing to show that this ruling was an administrative procedure developed in cooperation with state agencies under the mandate of § 9(a). Nevertheless, this statute does provide limited support for defendants' position.

Both sides invoke § 2 of the Act, 42 U.S.C. § 1751, which provides:

§ 1751. Congressional declaration of policy

It is declared to be the policy of Congress, as a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school-lunch programs. [14]

Defendants maintain that given the potential for waste in take-home programs, only in-school lunches will assure that the subsidized meals are actually eaten by the children whose health Congress desires to safeguard. They further stress the need for nutritional education in conjunction with the lunch program, and their belief that "[e]ating a school lunch with their peers is a useful socialization experience for

---

13. For those readers whose school boards offered lunch instead of Latin, this expression translates as "expression of one thing is the exclusion of another." Black's Law Dictionary 692 (4th ed. 1968).

14. For a discussion of the School Lunch Program generally, *see* Comment, *The National School Lunch Program, 1970: Mandate to Feed the Children,* 60 Geo.L.J. 711 (1972); Comment, *The National School Lunch Program,* 119 U.Pa. L.Rev. 372 (1970); Annot., 14 A.L.R.Fed. 634 (1973).

children . . . [and] has a direct educational value in nutrition." *Davis v. Robinson*, 346 F.Supp. 847, 853 (D.R.I.1972). However, as plaintiffs note, a take-home program does not foreclose supplemental instruction in the classroom on nutrition, which is desirable under any program. Also, plaintiffs urge that the parents of children in their districts prefer that students return home for lunch, as they traditionally have. The court is quite reluctant to conclude that the Act elevates the socialization experience of children eating together above the social value of contact within the family.

Defendants also contend in-school programs safeguard the well-being of children by reducing their exposure to traffic. This is a makeweight argument, and not illustrative of the intent of the Act.

Plaintiffs also cite the Act's policy declaration, arguing that USDA should not be able to effectively discourage the development of less expensive programs which still provide nutritionally adequate lunches. They also note § 20(a) of the Act, 42 U.S.C. § 1769(a), which authorizes the Secretary of Agriculture to conduct "pilot projects with respect to local school districts . . . for the purpose of determining whether there may be more efficient, healthful, economical, and reliable methods of operating school lunch . . . programs . . ." Plaintiffs believe that their programs, though not sanctioned as pilot projects, do constitute a more efficient and economical way of serving school lunches in certain districts, and should be encouraged, not prohibited. It is well documented that the lack of lunchroom facilities has been a reason why many school districts have failed to participate in the lunch program. *Davis v. Robinson*, 346 F.Supp. 847, 852 (D.R.I.1972); *Briggs v. Kerrigan*, 307 F.Supp. 295, 299–301 (D.Mass.1969), aff'd, 431 F.2d 967 (1st Cir. 1970); Comment, *The National School Lunch Program, 1970: Mandate to Feed the Children*, 60 Geo.L.J. 711, 718 (1972); Comment, *The National School Lunch Program*, 119 U.Pa.L.Rev. 372, 377 (1970). This problem led Judge Frankel, in a case concerning the responsibilities of local school boards

under the Act, to observe that "the commands of the statute, like those of the Constitution, are concerned with people, not facilities." *Justice v. Board of Education*, 351 F.Supp. 1252, 1262 (S.D.N.Y.1972).

While prohibition of take-home programs might further the statutory policy of preventing waste, the court also finds that such a prohibition might, however, contravene legislative policy to find cheaper methods for serving school meals and to thereby enable as many children as possible to benefit from the program. The policy implications of the various provisions do not provide a clear mandate on the take-home issue.

D. Legislative History

Since the provisions of the Act do not conclusively resolve the issue, the court must examine the legislative history. Congressional documents also demonstrate concern for schools which lack cafeteria and kitchen facilities. *E.g.*, Sen.Rep. No. 2016, 87th Cong., 2nd Sess., *reprinted in* 1962 U.S.Code Cong. & Admin.News, pp. 3244, 3255–56. There is also evidence of legislative intent that schools shift from pre-packaged lunches to hot meals. *E.g.*, H.R.Rep. No. 95–281, 95th Cong., 1st Sess. 7–8, 21, *reprinted in* 1977 U.S.Code Cong. & Admin. News, pp. 3517, 3523, 3536.

But most significant is the history of the original Act. Beginning in 1935 Congress authorized, on a year-to-year basis, appropriations for USDA to obtain agricultural commodities to donate to schools for their lunch programs. Then in 1946 Congress passed the National School Lunch Act, Pub.L. No. 79–396, 60 Stat. 230 (1946), which permanently established the basic subsidy program that exists today, and used the language "lunches served in the school." *Id.*, § 8.

The legislative history of the 1946 law illustrates that the legislators contemplated that lunches would be consumed in the schools. The House committee report accompanying House Bill 3370, which became Pub.L. No. 79–396, states the need for ade-

quate lunches "served at school." H.R.Rep. No. 684, 79th Cong., 1st Sess. 2, 3 (1945). The report also states at page 2:

> The increase of working mothers, consolidation of schools, greater travel time to schools, and rising scale of food costs . . . make the school-lunch program . . . the appropriate answer.

The listed concerns clearly imply anticipation that lunches would be provided and eaten on school grounds.

The Senate considered its Bill 962, portions of which were incorporated into H.R. 3370 and later into Pub.L. No. 79-396. The Senate committee report accompanying the bill expresses concerns similar to those mentioned in the House report:

> [A] difficulty to proper nutrition in childhood is the difficulty encountered by the child in obtaining a proper lunch *at school*. Distances from home to school are increasing. The increase in the number of working mothers and the consolidation of schools, make even the best-intentioned efforts of parents insufficient.

Sen.Rep. No. 553, 79th Cong., 1st Sess. 9 (1945) (emphasis added).

The report then speaks directly to the issue here:

> The school-lunch program democratically resolves all of these difficulties. The children eat a common well-chosen meal *together*, and learn at the same time what they should eat. *Ibid*. (emphasis added).

The report also includes a letter from the Acting Administrator of the National Security Agency, which indorses the bill and notes the need for lunchrooms and lunchroom supervisors under the program. *Id.* at 8.

While less authoritative than the committee reports, the remarks of various congressmen during the debates also indicate that in-school lunches were contemplated. For instance Representative Biemiller stated:

> My own son is enjoying the benefits of it at his public school in Montgomery County, Md. My wife assures me that he eats a larger lunch than he would at home because he is stimulated by companionship, and that he is learning to eat foods which he formerly refused. . .

> Some people seem to feel that it is more American for the children to carry lunch to school, or go home to eat it. It is, of course, impossible for country children to go home and inadvisable for many in the city to do so. I know that in some areas children run home eight blocks, spend 10 minutes gulping lunch, and run back again. This is, obviously, not good for them, nor is a cold lunch carried to school as desirable as a hot, well-balanced one.

92 Cong.Rec. 1469 (1946).

Other congressmen also mention the need for lunchrooms and lunchroom managers. *E.g.*, 92 Cong.Rec. 1627 (1946) (remarks of Sen. Ellender); 92 Cong.Rec. 1455 (1946) (remarks of Rep. Flanagan).

Finally, it is significant that plaintiffs have not cited and the court has not found anything in the history suggesting that legislators contemplated that subsidized lunches might be taken home for consumption.

The legislative history undeniably indicates that Congress wanted in-school lunches to be the mainstay of the program. And it was quite reasonable for USDA to find that Congress intended only in-school lunches should be served under the Act.

■ Given the degree of deference afforded USDA's interpretation of the law, the court must uphold the agency's conclusion that the Act does not require subsidy of take-home meals but rather prohibits the funding of such programs.

## VI. Conclusion

■ Based on the court's independent review of the statute, the Department of Agriculture's ruling must be sustained as a reasonably correct interpretation of the law. Since the general enabling provisions of the statute are properly construed as prohibiting reimbursement for take-home meals, then it must also be held that the

delegation of substantive rulemaking power cannot provide authority to enact a substantive rule on this issue. Therefore this ruling is properly deemed interpretative and § 553 notice and comment procedures are not required.[15]

The mandate of the Act is far from clear. It is unfortunate that Congress was not more specific concerning this important aspect of the meal program. Given this lack of specificity, the court is sympathetic to the plaintiff school districts' attempts to feed their students with a program that may best fit their limited budgets and the desires of their families.

While the court has upheld the USDA ruling given the deference properly accorded its statutory interpretation, this is not to say that the court would necessarily interpret the Act this way if the question had arisen in the first instance in judicial proceedings. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Baltimore and Ohio Chicago Terminal Railroad Co. v. United States,* 583 F.2d 678, 683 (3rd Cir. 1978), *cert. denied,* 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). Nor is it held that this court would necessarily overturn a USDA construction of the Act as permitting take-home lunches in certain cases after consideration of factual and policy matters through substantive rulemaking procedures.

But any further consideration is left to the Department of Agriculture. Its present decision must be upheld by this court, and the federal defendants' motion for summary judgment is granted. The propriety of the USDA rule also precludes any claim that the New Jersey Commissioner of Education breached a duty to plaintiffs, and the state's motion for summary judgment is granted. The complaint will be dismissed with prejudice.

---

**15.** The court declines to require any notice and comment procedures on the basis of common law notions of fundamental fairness which go beyond the APA mandate. *See e.g., Independent Broker-Dealers' Trade Ass'n v. SEC,* 142 U.S.App.D.C. 384, 442 F.2d 132, 144, *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971); 1 K. Davis, Administrative Law Treatise § 6: 31 at 596–99 (2d ed. 1978). Such a step is surely unnecessary here since one of the plaintiff school boards did have an opportunity to forward legal argument to USDA on the issue, and the opinion letter did not represent a sudden change in a prior position on which plaintiffs had relied. The court is also hesitant to reach beyond the APA in requiring rulemaking procedures because of the recent holding and dicta in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543–49, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In that case the Court overturned a Court of Appeals ruling that required an agency to go beyond the usual notice and comment for rulemaking under § 553, and generally expressed disapproval of judicial extension of APA requirements. *See also National Industrial Sand Ass'n v. Marshall,* 601 F.2d 689 at 699 n. 35 (3rd Cir. 1979), noting that *Vermont Yankee* could be read to prohibit judicial extensions of APA standards of review. *But see* 1 K. Davis, *supra,* § 6:36 at 609–10, where it is argued that *Vermont Yankee* does not prohibit courts from requiring notice and comment procedures for agency actions exempted from § 553.