Raymond J. DONOVAN, Secretary of the United States Department of Labor, Plaintiff,

v.

Dennis WALTON, et al., Defendants.

No. 81–6281–CIV.

United States District Court, S.D. Florida, N.D.

May 31, 1985.

Richard Carr, U.S. Dept. of Labor, Washington, D.C., for plaintiff.

Gerald Feder, Washington, D.C., for defendants.

## MEMORANDUM OPINION

GONZALEZ, District Judge.

Plaintiff Secretary of Labor files this action under Title I of ERISA alleging that defendant Trustees of the Pension Fund breached their fiduciary duties to the Fund's participants and beneficiaries by constructing and financing an Administration Building on Fund property and leasing space therein to the Union; by sponsoring a home mortgage loan program with Fund money; and by paying the Union for "in kind" services its members performed on the Fund's behalf.

Jurisdiction is properly premised on ERISA § 502(e)(1), 29 U.S.C.A. § 1132(e)(1) (West 1975) and 28 U.S.C.A. § 1331 (West Supp.1985); venue lies in the Southern Dis-

trict of Florida pursuant to ERISA § 502(e)(2), 29 U.S.C.A. § 1132(e)(2) (West 1975).

The Complaint names as defendants Dennis Walton, the Union's business manager, chief executive officer and a Fund Trustee; Harry Sattler, Donald Marra, John Sepielli, Rutherford H. Hewitt, Jr., Eugene Gamelin, Robert Sheeley and Donald Petenbrink, all Management-appointed Trustees; and A.F. Chandler and Joseph Gagne, president

and secretary of the Union, respectively, and also both Union-appointed Fund Trustees.[1] These Trustees are charged with violating ERISA §§ 404(a)(1)(A), (B), 405(a)(3), 406(a)(1)(B), (D) and 406(b)(2), 29 U.S.C.A. §§ 1104(a)(1)(A), (B), 1105(a)(3), 1106(a)(1)(B), (D), and 1106(b)(2).[2] Complaint ¶¶ 9–15 (filed May 20, 1981).

By Order dated March 3, 1983[3] and March 19, 1984,[4] the court disposed of the legal issues raised by the Fund's home

1. On July 2, 1980, Messrs. Gamelin and Hewitt replaced Messrs. Sepielli and Sattler, who had resigned effective on May 6 and June 30, 1980, respectively. Messrs. Marra and Gamelin resigned on April 10, 1981, and were replaced by defendants Sheeley and Petenbrink. Mr. Petenbrink resigned effective June 23, 1981; Mr. Sheeley resigned on or about June 25, 1981; Mr. Chandler resigned effective October 2, 1981; and Mr. Hewitt resigned effective October 14, 1981. None of the subsequent Trustees are named as defendants in this case.

2. The Complaint alleges that:
a) Messrs. Walton, Chandler and Gagne violated ERISA §§ 404(a)(1)(A), (B), 406(a)(1)(B), (D) and 406(b)(2) with respect to the development project, the participant mortgage loan program and the administrative services payments;
b) Messrs. Sattler, Marra and Seppielli violated ERISA §§ 404(a)(1)(A), (B) and 406(a)(1)(B), (D) with respect to the development project, the participant mortgage loan program and the administrative service payments;
c) Messrs. Hewitt and Gamelin violated ERISA §§ 404(a)(1)(A), (B), 406(a)(1)(B), (D) and 405(a)(3) with respect to the development project, the participant mortgage loan program and the administrative service payments; and
d) Messrs. Sheely and Petenbrink violated ERISA § 405(a)(3) with respect to the development project, the participant mortgage loan program and the administrative service payments.

3. The March 3rd Order addressed the propriety of a mortgage loan program sponsored by the Fund. Under the program, Fund participants and beneficiaries were eligible to apply for a home loan from the Fund at a competitive rate of interest, with the money coming from a $2 million pool set aside by the Trustees. (The $2 million represented some 7% of the Fund's total assets at that time.) Every borrower had to prove he was credit-worthy and financially stable, and each loan was secured by a first mortgage on the principal residence of the mortgagor. Additionally, title to each property was marketable and insurable; no loan was assumable unless specifically permitted by the Trustees; no loan exceeded ninety-five percent of the appraised value of the property; each borrower

had to secure mortgage insurance if his down payment was less than twenty percent of the appraised value; and a mortgagor-borrower had to assign his accrued pension benefits to the Plan as additional loan security. Based on these facts, the court held that the Trustees did not violate the fiduciary responsibility and prohibited transaction provisions of ERISA § 406(a)(1)(B) and (D), 29 U.S.C.A. § 1106(a)(1)(B) and (D), by establishing the mortgage loan program.

4. In its March 19th Order, the court held that the Trustees did not violate ERISA §§ 404(a), 406(a), 29 U.S.C.A. 1104(a), 1106(a) by paying the Union a total of $117,500 for "in kind" services performed by the Union's employees in connection with certain of the Fund's investments. No violation of section 406(a)(1)(D) occurred because the services and the resulting payment were statutorily exempt under section 408(b)(2) and the corresponding Labor Department regulations. Section 408(b)(2) exempts "[c]ontracting or making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." The facts clearly revealed that Union personnel performed substantial services for the Fund in its capacity as a developer, services that were directly related to the development of the Fund's real estate investment program and "necessary for the ... operation of the plan" in that respect. *See also* 29 C.F.R. § 2550.408b–2(b) ("A service is necessary ... if the service is appropriate and helpful to the plan ... in carrying out the purposes for which the plan is established and maintained", *e.g.*, successful investments that increase the income of the Fund). Furthermore, the reimbursement for investment-related administrative services was prudent. The services were in furtherance of "defraying reasonable expenses of administering" the Fund's real estate development. ERISA § 404(a)(1)(A)(ii). So too, the Management Trustees, with "care, skill, prudence, and diligence" and consistent with counsel's advice, assured themselves that the services were documented and the charged amounts were reasonable before they finally authorized payment. ERISA § 404(a)(1)(B).

mortgage loan program and its administrative services payments, respectively. When the court could not resolve the remaining legal questions on the parties' motions for summary judgment, *see* Order of March 19, 1984, it chose to sever the section 404(a)(1)(B) claim and try it first. A bench trial followed and, after considering the oral and written arguments of counsel, the admissible evidence and the testimony of all witnesses, the court found and entered a judgment for the defendants and against the plaintiff.

The demonstrative and testimonial evidence adduced at trial was sufficiently enlightening, however, so as to enable the court to revisit its March 19th Order and grant defendants' motion for summary judgment with respect to the Secretary's claims under ERISA §§ 404(a)(1)(A), 405(a)(3), 406(a)(1)(B), (D) and 406(b)(2).[5]

Section I of this decision reviews the relevant facts and law in this action. Neither the recitation of facts nor law in that Section is meant to be comprehensive, but rather serves to provide the reader with some perspective on this case. Section II sets forth the court's Findings of Fact and Conclusions of Law on the "prudence" issue of ERISA § 404(a)(1)(B) in accordance with Rules 52(a) and 58 of the Federal Rules of Civil Procedure. Finally, in Section III the court explains why summary judgment in the defendants' favor on the remaining issues is appropriate.

## I. OVERVIEW

### A. The Basic Facts

The Operating Engineers Local 675 Pension Trust Fund ("Pension Fund" or "Fund") is a multimillion dollar [6] program established on June 1, 1968 as the result of a collective bargaining agreement between the Associated General Contractors of America, Inc. and the International Union of Operating Engineers, Local 675. The Fund provides retirement benefits to operating engineers working under the subject labor contracts, and is funded by employer payments made for each hour of work performed by active participants under those agreements.

The Pension Fund is jointly administered by Trustees representing labor and management. They are charged with responsibility for the general supervision of the Fund's business and investment activities. The Trustees serve without compensation, and are reimbursed for their out-of-pocket expenses.

The instant lawsuit owes its origin to the Trustees' decision in 1979 to purchase and develop some 95 [7] acres of real estate in northern Broward County, Florida (referred to herein as the Copans tract or Copans property). At that time, the Trustees were not satisfied with the Fund's yield on investments, and they believed the acquisition of the property would bolster their capital returns. The decision to enter the real estate business was based on deliberative research and analysis by both the Trustees and independent consultants whom they retained.

At the time the Pension Fund purchased the Copans tract, one of its participating employee organizations—the International Union of Operating Engineers Local 675 ("Union")—had decided to sell its own building and look for new quarters. The Union and the Trustees were no strangers to one another; in fact, Dennis Walton served as both a Fund Trustee and the Union's business manager.[8] Since the Un-

---

**5.** The court's Orders of March 3 and March 19, 1984 disposed of the Secretary's other charges. *See supra* notes 3 & 4.

**6.** The only financial data in evidence, the Fund's 1983 Federal Income Tax Return, lists its net assets as $39,336,245. Plaintiff's Exhibit 44. Judging from the evidence in the record, the Fund's assets stood at some $28.5 million at the outset of the period in question.

**7.** Subsequent Pension Fund purchases brought the total acreage of the Copans tract up to 103 acres.

**8.** ERISA § 408(c)(3) permits a plan fiduciary to serve as an officer, employee, agent or other representative of an employer or union. 29 U.S.C.A. § 1108(c)(3); *see id.* § 1002(4), (5), (14). Logic demands that if a fiduciary may hold these positions, then he may fulfill the

ion was in need of a new "home" and the Fund was building a single-story high quality complex of its own, the Trustees decided to construct the Administration Building with the intention of landing the Union as a principal tenant. Even without the Union, however, the Trustees felt confident in going forward with the project because their independent studies had shown that the rental market for and the potential capital return on the project were very promising.

The Fund thus proceeded with the real estate venture, using its own money to buy the land and construct the Administration Building because of the then-prevailing unprecedented high interest rates.[9] The Building's design and construction were the product of competitive bidding, and the final cost totalled $1,873,000. The project's lone stumbling block was opposition by the Department of Labor ("DoL" or "Department"), which voiced concern over the Fund's leasing and construction arrangement with the Union and the former's financing of the venture with its own money rather than borrowing from a permanent lender.

■ The Trustees directed Fund Counsel to discuss with the Department ways of settling their differences. These discussions proved fruitless and the Trustees decided to move forward with the construction project and anticipated leasing arrangement based on their belief, confirmed by Counsel, that certain DoL regulations exempted them from liability under federal labor laws.[10]

Not surprisingly, the DoL filed suit against the Trustees in May 1981, charging them with breaching their fiduciary duties as set forth in the Employee Retirement Income Security Act of 1974 ("ERISA" or "Act"), Pub.L. No. 93–406, 88 Stat. 329 (codified at 29 U.S.C.A. 1001–1381 (West 1975 & Supp.1976–1985)), by approving of allegedly imprudent Fund transactions with persons whose interests were adverse to the Fund's participants and beneficiaries.[11] As set forth in the Complaint, the Trustees stand accused of violating the "exclusive purpose" and "prudence" rules of ERISA § 404(a)(1)(A) and (B), 29 U.S.C.A. § 1104(a)(1)(A) and (B), respectively; the "parties in interest" guidelines of section 406(a)(1)(B) and (D), 29 U.S.C.A. § 1106(a)(1)(B) and (D); and the prohibition against "self dealing" in section 406(b)(2), 29 U.S.C.A. § 1106(b)(2).

Before proceeding to the merits of the case, the court pauses to review the salient provisions of ERISA itself.

### B. The Basic Law

■ ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in employee benefit plans.[12] *Nachman Corp. v. Pension*

---

concomitant responsibilities. *See Evans v. Bexley,* 750 F.2d 1498, 1499 (11th Cir.1985) (citing *Curren v. Freitag,* 432 F.Supp. 668, 671 (S.D.Ill. 1977)) (plan trustee may also represent employee organization or employer in collective bargaining negotiations that determine plan funding).

9. Had the Pension Fund obtained [the financing for the project] from an outside lending institution in the form of a construction loan, ... it would have been required to pay substantial interest sums on the loan, *e.g.,* prime plus several points. During the period mid-1980 to mid-1981, when construction was under way, the prime lending rate ranged from 11% all the way to 20%. For permanent financing ..., the interest rate on a 15–20 year long-term loan would have been around 13%.
Department of Labor Pretrial Stipulation ¶ 32 at 16 (filed Jan. 21, 1985).

10. The Trustees' reliance on Counsel's advice does not shield them from ERISA liability, but is one of the factors relevant to determining whether they acted prudently. *See Davidson v. Cook,* 567 F.Supp. 225, 239 (E.D.Va.1983).

11. This broad statement of the DoL's allegations is not exhaustive but does generally cover the panoply of claims in its Complaint.

12. In this context the employee is referred to as a plan "participant": "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan ..., or whose beneficiaries may be eligible to receive any such benefit." 29 U.S. C.A. § 1002(7). A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *Id.* § 1002(8).

**1228**

*Benefit Guaranty Corp.,* 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726–27, 64 L.Ed.2d 354 (1980). Borrowing from the common law of trusts, Congress established minimum standards for vesting and funding of benefits, executing of fiduciary responsibilities, reporting to the government and disclosing information to participants. *See Donovan v. Dillingham,* 688 F.2d 1367, 1370 (11th Cir.1982); *Marshall v. Teamsters Local 282 Pension Fund,* 458 F.Supp. 986, 990 (E.D.N.Y.1978); H.R.Rep. No. 93–533, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4649, 5186.

Title I of the Act "protects" plan participants and beneficiaries by regulating the conduct of their plan trustees. A trustee of an employee benefit plan such as the Operating Engineers Local 675 Pension Trust Fund, 29 U.S.C.A. § 1002(3), is a fiduciary for purposes of ERISA if he exercises discretionary authority over the plan's management or administration, or renders investment advice to the plan for a fee. *Id.* § 1002(21)(A); 29 C.F.R. § 2509.75–8 (question D–3) (1984); *see Evans v. Bexley,* 750 F.2d 1498, 1499 n. 2 (11th Cir.1985).

ERISA § 404(a)(1)[13] sets forth a trustee's general fiduciary duties of loyalty and prudence. 29 U.S.C.A. § 1104(a)(1). The "exclusive purpose" rule of section 404(a)(1)(A) requires a fiduciary to discharge his duties solely in the interest and for the exclusive purpose of providing benefits and defraying administrative expenses. The federal courts have described this responsibility as the duty to act with "complete and undivided loyalty to the beneficiaries," *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 639 (W.D.Wis. 1979), and with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2nd Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Section 404(a)(1)(B), known as the "prudence" rule, demands that a fiduciary perform his responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." Prudence is measured according to the objective "prudent person" standard developed in the common law of trusts. A court's task is to inquire whether the trustees, at the time they engaged in the challenged transaction, employed the appropriate methods to investigate and/or structure the investment. *Katsaros v. Cody,* 744 F.2d 270, 279 (2nd Cir.1984). The analysis considers the trustees' *conduct* and not the success or failure of the investment. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983).[14] As the language of section 404(a)(1)(B) makes clear, the "prudence" standard is flexible: the adequacy of a fiduciary's investigation is to be evaluated in light of the "character and aims" of the particular type of plan he serves. *Id.* & n. 26. The legislative history cautions, however, that courts should

---

**13.** Section 404(a)(1) provides in pertinent part:
Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .

29 U.S.C.A. § 1104(a)(1) (West 1975).

**14.** In *Cunningham,* the court refused to determine whether the consideration paid by a fiduciary for employee stock was "adequate," inquiring instead whether the price paid by the trustee was the fair market value of the asset as determined in good faith by the fiduciary. 716 F.2d at 1467. *Accord Marshall v. Glass/Metal Association,* 507 F.Supp. 378, 384 (D.Haw.1980) ("ERISA does not require that a pension fund take no risks with its investments. Virtually every investment entails some degree of risk, and even the most carefully evaluated investments can fail while unpromising investments may succeed.")

interpret the section "bearing in mind the special nature and purpose of employee benefit plans." H.R.Rep. No. 93–1280, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News at 5083; *accord Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

ERISA § 406 [15] supplements the broader provisions of section 404(a)(1) with a detailed list of specifically prohibited transactions. Congress included these provisions "to insure arm's-length transactions by [plan] fiduciaries," *M & R Investment Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir.1982), and to minimize conflicts-of-interest among trustees, plan members and third parties.

For example, a trustee may not lend money or transact business with either a "party in interest", 29 U.S.C.A. § 1106(a)(1)(B), (D), or a party whose interests are adverse to the fund or its participants or beneficiaries. *Id.* § 1106(b)(2). The prohibited transaction rules of section 406 are "an important part of Congress's effort to tailor traditional judge-made trust law to fit the activities of fiduciaries functioning in the special context of employee benefit plans." *Cunningham*, 716 F.2d at 1464.

As originally construed, section 406 was designed "to make illegal *per se* the types of transactions that experience had shown to entail a high potential for abuse," *Cunningham*, 716 F.2d at 1464, including real estate investments and the relationships derived therefrom. Yet the practical necessities of the plan-union relationship made many of these prohibitions impractical, and thus the DoL promulgated specific exceptions to the *per se* rules known as Prohibited Transaction Exemptions ("PTE"). One such exemption, PTE 76–1, 41 Fed.Reg. 12,740 (1976),[16] eases the restrictions of

---

**15.** Section 406 reads in relevant part:

(a) Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

. . . .

(B) lending of money or other extension of credit between the plan and a party in interest;

. . . .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. . . .

. . . .

(b) A fiduciary with respect to a plan shall not—

. . . .

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries. . . .

29 U.S.C.A. § 1106 (West 1975).

**16.** PTE 76–1 provides in pertinent part:

*Sec. I. Prospective.* Effective June 12, 1975, the restrictions of sections 406(a) and 407(a) of the Act ... shall not apply to the leasing of office space or the provision of administrative services or sale or leasing of goods by a multiple employer plan to a participating employee organization, participating employer, or participating employer association, or to another multiple employer plan

which is a party in interest or disqualified person with respect to such plan, provided that the following conditions are met:

(a) The plan receives reasonable compensation for the leasing of such office space or the provision of such administrative services or the sale or leasing of goods. Solely for purposes of this exemption, "reasonable compensation" need not include a profit which would ordinarily have been received in an arm's length transaction, but must be sufficient to reimburse the plan for its costs.

(b) The arrangement allows any multiple employer plan which is a party to the transaction to terminate the relationship on a reasonably short notice under the circumstances.

(c) With regard to the leasing of office space by a multiple employer plan to a participating employer, such transaction will be exempt from the provisions of sections 406(a)(1)(E), 406(a)(2) and 407(a) of the Act only to the extent such provisions require that such office space constitute "qualifying employer real property" as that term is defined in section 407(d)(4) of the Act. The 10 percent limitation provisions of sections 406(a)(1)(E) and 407(a) of the Act will apply to such transactions as if the employer real property involved in the transaction were "qualifying employer real property."

(d) The plan which is the lessor of such office space or which provides such administrative services or goods, maintains or causes to be maintained during the period of such lease or of such provision of services or sale or leasing of goods and for a period of six

section 406(a) and permits multiple employer plans (or funds) to lease office space or provide administrative services to a participating employee organization (or union) provided the plan receives reasonable compensation, the lease permits the plan to terminate the arrangement on reasonably short notice, and the plan retains adequate records.

Another exception to the *per se* rules is PTE 77–10, 42 Fed.Reg. 33,918 (1977).[17]

---

17. PTE 77–10 reads in relevant part:

[T]he following exemption is hereby granted under authority of section 408(a) of the Act and in accordance with the procedures set forth in ERISA Procedure 75–1:

*Sec. I-Prospective.* Effective June 12, 1975, the restrictions of section 406(b)(2) of the Act shall not apply to the sharing of office space, administrative services or goods or the leasing of office space or the provision of administrative services or sale or leasing of goods by a multiple employer plan established in accordance with the requirements for representation on the board of trustees imposed by section 302(c)(5) of the Labor Management Relations Act, 1947 (LMRA) to a participating employee organization, participating employer, or participating employer association, or to another such multiple employer plan which is a party in interest with respect to the plan or to which it is related by virtue of having common trustees, provided that the following conditions are met:

. . . .

(b) With respect to the leasing of such office space or the provision of such administrative services or other sale or leasing of goods, the plan receives reasonable compensation for such leasing, or the provision of such services or the sale or leasing of such goods. Solely for purposes of this exemption, "reasonable compensation" need not include a profit which would ordinarily have been received in an arm's-length transaction, but must be sufficient to reimburse the plan for its costs.

(c) With respect to the sharing of office space, administrative services or goods or the leasing of office space or the provision of administrative services or the sale or leasing of goods, the arrangement allows any plan which is a party to the transaction to terminate the transaction on reasonably short notice under the circumstances.

(d) Any plan which . . . is the lessor of such office space . . ., maintains or causes to be maintained during the period of such . . . lease . . . for a period of six years from the date of termination of such lease . . . such records as are necessary to enable the persons described in paragraph (e) of this section to determine whether the conditions of this exemption have been met, except that (1) prohibited transaction will not be deemed to have occurred if, due to circumstances beyond the control of the plan fiduciaries, such records are lost or destroyed prior to the end of such six-year period, and (2) such participating employee organization, participating employer, participating employer association, or other plan shall not be subject to the civil penalty which may be assessed under section 502(i) of the Act if such records are not maintained, or are not available for examination as required by paragraph (e) below.

(e) Notwithstanding anything to the contrary in subsections (a)(2) and (b) of section 504 of the Act, the records referred to in paragraph (d) are unconditionally available at their customary location for examination during normal business hours by (1) the Department of Labor, (2) plan participants and beneficiaries, (3) any employer of plan participants and beneficiaries, and (4) any employee organization any of whose members are covered by the plan, or (5) any duly authorized employees or representatives of a person de-

years from the date of termination of such lease or such provision of services or sale or lease of goods, such records as are necessary to enable the persons described in paragraph (e) of this section to determine whether the conditions of this exemption have been met. . . .

(e) Notwithstanding anything to the contrary in subsections (a)(2) and (b) of section 504 of the Act, the records referred to in paragraph (d) are unconditionally available at their customary location for examination during normal business hours by duly authorized employees of (1) the Department of Labor, (2) the Internal Revenue Service, (3) plan participants and beneficiaries, (4) any employer of plan participants and beneficiaries, and (5) any employee organization any of whose members are covered by the plan.

*Sec. II. Retroactive.* Effective January 1, 1975, the restrictions of sections 406(a) and 407(a) of the Act . . . shall not apply to the leasing of office space or the provision of administrative services or the sale or leasing of goods by a multiple employer plan to a participating employee organization, participating employer, or participating employer association, or to another multiple employer plan which is a party in interest or disqualified person with respect to such plan, which occurred before June 12, 1975, or which occurred before October 1, 1975 pursuant to a binding arrangement entered into before June 2, 1975, provided that such transaction was—

(a) Of a type that was ordinarily and customarily engaged in by multiple employer plans before January 1, 1975. . . .

This regulation exempts the fund-union lease arrangement authorized by PTE 76–1 from the "self-dealing" prohibitions of ERISA § 406(b) provided the requirements of PTE 76–1 are again satisfied. The Trustees in the instant case argue that PTE 76–1 and 77–10 shield them from ERISA liability under section 406.

ERISA § 405(a)[18] imposes on each trustee an affirmative duty to prevent any other trustee of the same fund from breaching the fiduciary duties set forth in section 404. 29 U.S.C.A. § 1105(a). Section 405(a)(3), for example, imposes liability on a trustee who has knowledge of another's breach yet fails to make "reasonable efforts under the circumstances to remedy the breach." *Id.* § 1105(a)(3). If a breach occurs, the fiduciary may be held jointly and severally liable to the plan for any losses resulting therefrom during his tenure as trustee, and is subject to other equitable or remedial relief deemed appropriate. 29 U.S.C.A. § 1109(a).

 In applying ERISA to the facts in this case, the court is mindful that it must reach a result that safeguards the interests of fund participants and beneficiaries yet preserves the institutional incentives for union's to establish pension funds; competent fiduciaries should be encouraged to serve "without giving unscrupulous ones a

license to steal." *Cunningham,* 716 F.2d at 1466. Although the Act is a creature of the common law, the latter's "prophylatic rules ... cannot be incorporated reflexively under the statute." *Id.* at 1466–67.

## II. THE "PRUDENCE" ISSUE OF ERISA § 404(a)(1)(B)

Although the Secretary's Complaint charges the Trustees with a number of ERISA violations, the court elected to try initially only the issue of fiduciary liability under section 404(a)(1)(B). This portion of the decision sets forth the court's Findings of Fact and Conclusions of Law based on that proceeding.

### A. Findings of Fact

### 1. Acquisition and Proposed Development of Copans Property

1. In response to growing dissatisfaction with the lack of diversification and yield of Fund investments, the Board of Trustees appointed a Building and Planning Committee to evaluate the Fund's investment program in February 1978. As part of that assessment, the Committee considered the merits of real estate investment, which heretofore had not been the target of Fund dollars. TR 193[19] On De-

---

scribed in subparagraphs (1) through (4) of this paragraph.

*Sec. II. Retroactive.* Effective January 1, 1975, the restrictions of section 406(b)(2) of the Act shall not apply to the sharing of office space ... or the leasing of office space ... by a multiple employer plan established in accordance with the requirements for representation on the board of trustees imposed by section 302(c)(5) of the LMRA to a participating employee organization, participating employer, or participating employer association, or to another such multiple employer plan which is a party in interest with respect to the plan or to which it is related by virtue of having common trustees, which occurred before June 12, 1975, or which occurred before October 1, 1975 pursuant to a binding arrangement entered into before June 2, 1975, provided that such transaction was:

(a) Of a type that was ordinarily and customarily engaged in by multiple employer plans before January 1, 1975....

**18.** Section 405(a) reads:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C.A. § 1105(a) (West 1975).

**19.** Reference to the Transcript of the bench trial on ERISA § 404(a)(1)(B) liability is denoted by the abbreviation "TR" followed by the page number.

cember 19, 1978, Dennis Walton—representing the Committee—recommended to the Trustees at large that the Fund purchase a ninety-five acre tract of land known as the Andrews Avenue Business Park located north of Copans Road and east of Powerline Road in Broward County, Florida. In the Committee's view, the acquisition of the property would satisfy the Fund's need to diversify its portfolio while providing the dual benefits of prudent returns and employment opportunities for Fund participants. TR 51, 193–195; Plaintiff's Exhibit 3. The asking price for the land was $25,000 per acre, or approximately $2.375 million for the entire parcel; a $10,000 refundable deposit would give the Fund a thirty day option to purchase the property. The availability of the Copans tract appeared fortuitous, for at that time the Union owned and occupied a multi-story building in Fort Lauderdale that had proven "economically unfeasible" to operate profitably because of its residential setting. TR 46–47. The Trustees reasoned that the Union could become a principal tenant of an office building ("Administration Building") projected for the Copans site.

2. Before the Trustees voted on the Walton proposal, they discussed whether the investment would be "prudent, in the exclusive benefit of Plan participants, and not otherwise in violation of ERISA." Plaintiff's Exhibit 3. Robert Sugerman, Pension Fund Counsel, opined that the purchase of the land would not constitute a prohibited transaction under ERISA and suggested that the Trustees obtain an appraisal of the property and further research the matter. After taking into consideration the opinion of Counsel and the report of the Building and Planning Committee, the Trustees tentatively decided to acquire the option on the property, retain an appraiser and real estate consultant to assess the value of the land, and obtain soil borings to determine the suitability of the land for development.

3. The soil borings revealed that the land was suitable for development, and the property was appraised at $24,500 per acre by one appraiser and $25,000 per acre by

another. A consultant contacted by the Trustees to determine the economic feasibility of constructing a building on the Copans tract indicated that he could not report back until the site was selected and an architect had prepared a design. Accordingly, in March 1979 the Building and Planning Committee solicited bids from five different architectural firms and presented them to the Board of Trustees, from which the Board selected the firm of Michael A. Shiff & Associates, Inc. to design the development, including the Office Complex.

4. At approximately the same time, the Union sold its own building and transferred $10,000 to the Fund as a good faith deposit toward securing a long-term lease in the planned Administration Building. TR 54, 1076.

5. On April 27, 1979, the Pension Fund purchased the ninety-five acres of land constituting the Copans site. The total purchase price was $2.37 million, or approximately $25,000 per acre. TR 57. The Fund paid $1.8 million cash at closing and assumed two small mortgages on the land. The mortgages have subsequently been paid off, and the Fund owns the land free and clear, together with eight additional acres purchased in 1980 for approximately $525,000. Defendant's Exhibit 218. At the time of closing, interest rates stood at or near an all-time high. TR 123, 125; Plaintiff's Exhibit 46A at 8.

6. With the land finally purchased, the architect proceeded in June 1979 to submit to the Board a site analysis and design plan for the proposed Office Complex. Mr. Shiff's Master Plan called for development in three phases: The first phase included basic landscaping and construction of access roads and an Administration Building and Auditorium. Phase two included the development of temporary recreation facilities and a permanent park. Phase three called for subdivision and sale over a thirty year period of fifty-four individual lots for light industrial development. TR 60–61. The total cost for phase one of the develop-

ment was estimated to be $1,524,361, or $53 square ft. ("ft.²"). In December 1979, the architect revised this figure upward to $1,851,500. Plaintiff's Exhibit 22. Once the architect had made the plans and cost estimates available to the Board, the Trustees retained the real estate consultant company of Administrative and Construction Services, Inc. to review and evaluate the proposal.

7. In the meantime, the Trustees directed the architect to solicit bids for construction of the Office Complex. On February 6, 1980, the firm of Andrew H. Warner, Inc. was selected to construct the Administration Building and Auditorium. Warner's bid was $2,619,190, an amount substantially greater than the architect's revised figure. TR 69; Plaintiff's Exhibit 7.

8. At about the same time, Administrative and Construction Services, Inc. submitted its analysis of the architect's plan to the Board. Mr. E. Abraben, speaking for the company, explained that the proposed construction of the Administration Building and Auditorium was not economically feasible and recommended that the Board abandon the Shiff plan. Plaintiff's Exhibit 7 & 24; TR 118–119. According to the consultant's report, the estimated total cost for the project would be some $2,150,000, compared with the architect's figure of $1,851,-000. Furthermore, the price of the Building appeared to be far in excess of what a comparable building of superior quality would cost. Mr. Abraben stated that a structure of excellent quality—like the proposed Administration Building—should cost no more than $50 per square foot to construct, yet under the Shiff plan the average cost of construction would be $67.30/ft.² The consultant did suggest that the proposed Complex could be built at a reasonable cost if the Board ordered revisions in the design and construction plans, including the use of a different roof, electrical and mechanical fixtures, exterior wall materials, and the postponement or elimination of the Auditorium.

9. In light of the consultant's report indicating that the construction of the Ad-ministration Building and Auditorium as planned by the architect would present significant cost overruns, the Trustees unanimously voted to eliminate the Auditorium from the initial phase of construction and to negotiate with Mr. Shiff for implementation of the Abraben proposals. Plaintiff's Exhibit 7; TR 71. These negotiations proved successful and the plans for construction of the Administration Building incorporated the Abraben changes.

10. In addition to retaining Administrative and Construction Services, Inc. to evaluate the architect's plans, the Board hired the Washington, D.C. law firm of Seifman and Lechner as special ERISA counsel. Plaintiff's Exhibit 7. Furthermore, with the finalization of the architect's plans now adopting Mr. Abraben's suggestions, the Fund contracted with Donald M. Pierce, a real estate appraiser and consultant, to conduct a study of the feasibility of developing the Copans property. Plaintiff's Exhibit 55.

11. The financial analysis of the Copans development prepared by Donald Pearce indicated that by March 1980, the Copans tract had appreciated some 56%, from $25,-000 to $39,000 per acre. The evaluation also suggested that development of the site as an office/light industry park was the highest and best use for the land and that after development into lots, the Pension Fund could expect a profit of either 40% or in excess of 58%, depending on the method of financing used by the Trustees. Mr. Pearce estimated that a three-year sales program would be necessary to market these lots, and that the park-like atmosphere and proposed Auditorium (if eventually built) would enhance the value of the property by an additional 10%. The study concluded that the Administration Building would cost $70.93/ft.² to construct, while the average cost of construction of excellent quality office buildings in the area at that time was between $62.26 and $79.58/ft.² Plaintiff's Exhibit 55.

12. Armed with a favorable consultant's report and a new design that promised to keep the Pension Fund within its budget,

the Board executed a contract with Andrew H. Warner, Inc. on June 5, 1980, to build the Administration Building. Plaintiff's Exhibit 27.

### 2. Construction and Cost of Administration Building

13. Site work and construction of the Administration Building began shortly after execution of the contract with the Warner firm. The Building itself was designed and constructed in large part to suit the needs of the Union. Plaintiff's Exhibit 7. The Building was ostensibly intended to be the Union's headquarters, and the Fund planned on the Union being a principal tenant. TR 115–116, 1078. The contractor used union labor in constructing the building, which added to the overall cost. TR 223.

14. Construction of the Administration Building was completed by August 1981. The Building was erected on 2.23 acres of the Copans property at a total cost of $1.873 million. Based on the Pension Fund's calculations, the Building is 11,258 square feet, of which the Union wing comprises 6,576 ft.[2]

15. As the court observed first hand, the Administration Building consists of corporate grade offices and conference rooms. Dennis Walton's office in particular is quite large and handsomely furnished. TR 90, 102, 175, 227–228.

### 3. Lease Agreement Between Pension Fund and Union

16. As the Administration Building neared completion on June 21, 1981, the Board of Trustees formally hired Greater Boston Realty Advisors, Inc. ("GBRA") to negotiate leases with prospective tenants. GBRA was registered with the Securities and Exchange Commission as an investment advisor at the time it began work for the Board. Denison Hall was President of GBRA and served as the Fund's fiduciary in his capacity as investment manager. TR 1023. Under the arrangement established with the Board, Mr. Hall was given control only of those Fund assets specifically set aside for his use. Defendant's Exhibit 134; TR 2033. Furthermore, the Board could terminate its relationship with him upon short notice. TR 1034.

17. In July and August 1981, the Pension Fund and the Union proceeded to negotiate a lease for the Union's rental of a portion of the Building. Dennis Walton represented the Union and Denison Hall represented the Fund.

18. In establishing the Union's rent, Mr. Hall was guided by several assumptions and objectives. First, he assumed that the total cost for land and construction would be $1.8 million as represented in the report of the Fund's outside accountant, Harold L. Schwartz. TR 258, 1038. (Actually, the accountant's June 23, 1981 cost projections indicated that the Fund's out-of-pocket costs for construction of the Building and land were $1,750,200. Mr. Hall simply added to that figure another $50,000 to offset any underestimate which may have existed in the Trustee's cost projections.) Mr. Schwartz's figure did not include costs related to hypothetical interest or fees. TR 641. Second, Mr. Hall consulted with people knowledgeable about the South Florida real estate market to determine what rental rates would be tolerated. TR 1048. Third, he determined that the Fund should receive a current return on equity of 10% over a five-year period which, he believed, would compensate for inflation, enable the Fund to recover its costs, and be sufficiently high so as to dispell concerns about the advisability of the investment. TR 1044, 1061, 1122.

19. Once he settled on a rate of return, Mr. Hall determined how much rent the Union would pay the Fund. He knew based on the projected construction plans that the Union would be occupying 57.5% of the net rentable space in the Building. He thus charged the Union for both its own office space and 57.5% of the operational expense of the common areas, and reached an annual rental of $107,000. TR 133–134, 1044–1047.

20. Dennis Walton considered the $107,-000 figure too high, and threatened to lease space elsewhere unless Mr. Hall lowered the Union's rent. The ensuing negotiations between the two representatives were "heated, loud [and] argumentative," TR 1059, but an arrangement was soon worked out. Rather than pay the Fund $107,000 annually, Mr. Hall permitted the Union to stagger the payment schedule so that during the five-year term of the lease the Union paid $80,000 in the first year; $90,-000 in the second year; $100,000 in the third year; and $132,000 in the fourth and fifth years. This staggered scheme, commonly found in the real estate industry, TR 1136, enabled the Fund to collect an average annual rental of $107,000 from the Union, an amount sufficient both to enable the Fund to realize its goal of an average return over the life of the lease of 10%, TR 1060–1061, 1087, and to properly amortize the construction and land costs allocable to the Union portion of the Building. This sum also represented almost three times the amount the Union had previously been paying in rent for office space in Fort Lauderdale.

21. Based upon the rent schedule and the Union's use of 57.5% of the net rentable space in the Administration Building, the Union's rent on a square foot basis was $12.36 the first year; $13.90 the second year; $15.45 the third year; and $20.47 the fourth and fifth years. The five-year average rental was $16.53 per square foot, and was at the upper end of prevailing rates in the Fort Lauderdale area at that time. TR 1061.

22. After Fund Counsel approved of the lease arrangement with the Union, TR 1067, the parties executed a rental agreement on August 6, 1981. The term of the lease commenced the next day when the Union moved into the Building. The contract was a "triple net" lease, with the Union reimbursing the Pension Fund for its pro rata share of property taxes, utilities, maintenance expenses and costs related to common areas. The lease provided that the Fund could terminate the arrangement either upon ninety days written notice to the Union, or if any court or government agency found the agreement unlawful under any provision of ERISA or the Internal Revenue Code. Plaintiff's Exhibit 36; TR 176.

23. Mr. Hall conceded that the Union was able to win a staggered rental fee arrangement and quickly move into the Building due to its substantial bargaining leverage. After all, the Building was constructed with the intention of housing the Union as the "anchor" tenant, TR 91, 102, 1078, and a Union threat to lease space elsewhere had to be taken seriously. TR 1085. Yet for all of its leverage, Mr. Hall refused to yield on any other Union demand: he did not permit the Union to offset its rent with in-kind services performed by Union members for the Fund, TR 1066; and he refused to lower the Union's rent a nickel more under a DoL transaction exemption. TR 1058, 1060, 1133, 1136. Although such a negotiating posture was admittedly risky, Mr. Hall believed that he could find other tenants within three to six months if the Union did not sign a lease. TR 1097.

### 4. Exclusion of Imputed Interest and Developer's Fee in Calculating Union Rental

24. The rental rate charged the Union included neither the Fund's "cost" of using its own money to finance the purchase of land and the construction of the Administration Building—referred to herein as "imputed interest"—nor a developer's fee. TR 126.

25. The DoL retained the services of Ralph Bowden, President and Director of Hunter Moss and Co.—a real estate consulting firm—to demonstrate empirically that it was not economically feasible for the Fund to construct a building comparable to the Administration Building, charge the Union an average rental that did not include the Fund's "imputed interest" and developer's cost, and still expect an annual yield of 10%. TR 788.

26. In order to accomplish this task, Mr. Bowden turned to John Condon, President of J.A. Condon & Associates, Inc.—specialists in construction costs and management—to determine what a willing owner would pay a qualified contractor to construct a structure comparable to the Administration Building in 1980–1981. Plaintiff's Exhibit 47A; TR 344, 419. Mr. Condon concluded that a "high class" office building ready for occupancy would cost $71.18/ft.$^2$ as of June 1980. Since the Fund's Building was a single-story structure, he subtracted from that figure the unit cost of an elevator and architect's fees and arrived at a final cost of $60.70 per square foot. Plaintiff's Exhibit 47A; TR 308–309.

27. Mr. Condon relied on *Marshall's Valuation Service ("Marshall's")* in arriving at the $60.70/ft.$^2$ figure. *Marshall's* contains a breakdown of the average national cost for virtually every component of a building. Once Mr. Condon determined the quality of the Administration Building and its essential components, he merely added up the individual component costs and arrived at the final figure. TR 297, 359–361, 402.

28. By Mr. Condon's own admission, the figures in *Marshall's* are of limited utility because (a) they reflect national and not regional or site-specific costs, TR 406; (b) they do not indicate whether a project is built with union or nonunion labor, TR 407; (c) they are based on an unknown number of construction projects around the country, TR 408, and (d) there is no indication whether the figures represent a mean or a median. TR 408.

29. Mr. Condon also admitted under questioning that his analysis failed to take into account several special features of the Building that added to its costs, including: (a) the expensive fluted block on the Building's exterior, TR 416; (b) a computer room and attendant wiring, TR 418–421; (c) air conditioning and heating units, TR 428; (d) window coverings, TR 447, alarms, and interior finishes; and (e) the Building's L-shaped design, which contains more linear feet of wall space and costs more than a square-shaped structure. TR 433–435.

30. Had Mr. Condon taken into account these special features, the square foot cost of the Building could have been at least $72.98. This figure does not include labor costs. TR 429–441.

31. With Mr. Condon's report in hand, Mr. Bowden set out to determine whether it was economically feasible for the Fund to realize a 10% annual cash-on-cash return given the rental charged and the construction costs incurred.[20]

---

**20.** In its direct examination of Mr. Bowden, the DoL focused almost exclusively on the reasonableness of the Fund-Union rent schedule. Interestingly, however, the Department initially requested that Mr. Bowden also analyze the Administration Building's impact on future development of the surrounding tract, and the accuracy and appropriateness of the Fund's space and cost allocations. Defendant's Exhibit 218. The latter investigation relies in large measure on John Condon's report, and thus any deficiencies in that analysis substantially undermine the credibility of Mr. Bowden's subsequent work. As for the Building's impact, the DoL has conveniently failed to make that an issue in the trial, and with good reason, for Mr. Bowden concluded that the Administration Building is a very successful project. Consider but a few relevant passages from the Bowden Report.

The demand characteristics of [the geographic market in which the Administration Building is located] were strong with the nineteen buildings surveyed in 1980.... Recently completed buildings during 1980 performed well. The 270,859 square feet completed during 1980 exhibited an occupancy rate of 97%. Similar strength was demonstrated during 1981.

....

The[ ] circumstances which prevailed in [the relevant geographic rental market] during 1980–1981 were sufficiently positive to justify and encourage the consideration of developing a speculative rental office building within the market area. New buildings in the area were being quickly leased and rental rate trends were tracking upward. During the same period, the major obstacle to real estate development was unusually high short-term interest rates.

Plaintiff's Exhibit 46A at 8. The court notes parenthetically that the extremely high interest rates Mr. Bowden alludes to in his report is one of the principal reasons why the Trustees decided to finance the construction of the Building with Fund money.

32. Assuming that the Fund included its "imputed interest" in the Union's rental, TR 539, Mr. Bowden first concluded that the Union would have to pay $20.32/ft.$^2$ to recover its desired 10% return. Including a developer's fee and a 12% rate of return would have necessitated a rent of $21.85/ft.$^2$ Second, he found that median rental costs for very good quality office space in the Fort Lauderdale area in 1980–1981 were in the $8–$12/ft.$^2$ range, indicating that the Union's average rental of $16.53/ft.$^2$ was not competitive in the office leasing market. TR 743, 745–747, 877. Third, he opined that under the 1980–1981 rent schedule, the Fund's annual return on its investment was only between 3% and 7%. Plaintiff's Exhibit 46A.

33. In arriving at his "ideal" rental figures, Mr. Bowden admitted that he failed to take into account: (a) the special interior finishes of the Building, including its computer room, wall coverings and window trimmings, TR 632, 660–661; (b) the Building's long-term investment potential for the Pension Fund, TR 643, 646–647, 688–689, 701; and (c) comparable rents in the same geographic rental market.

34. Mr. Bowden testified that he did not know whether the accounting profession requires that interest payments and developer's fees not incurred by a landlord/owner be imputed as a cost factor in assessing rents. TR 602–604. At best, he could only opine that the Fund's failure to add imputed interest and the cost of a developer to the Union's rent is a practice not seen with regularity in the industry. TR 873–874.

35. In order to rebut the DoL's charge that the Trustees imprudently failed to include imputed interest and the developer's fee in the Union's annual rent, the defendants called to the stand the Fund's independent real estate advisor, Denison Hall. Mr. Hall testified that he did not believe it was proper to include those costs in the Union's rent because the Fund used equity capital rather than debt to finance the Administration Building's construction. TR 1041, 1056. He explained that:

Equity capital typically has as its components of return a current return on investment, a future increase on that return in the form of additional rents and, ... whatever appreciation inures to the owner of that equity over time in the form of a sale or refinancing.

On the other hand, debt typically takes the form of an investment of principal and a note to evidence that indebtedness at a rate of interest which would be reflected in the note.

TR 1056–1057. Mr. Hall knew of "no concept pertaining to an equity investment where you would impute interest." TR 1050. He supported the Trustees' decision to finance the purchase of land and construction of the Administration Building with its own money because it would minimize the Fund's investment risk and avoid the problems then presented by extremely high interest rates. TR 1051, 1053.

36. The Union's rent did not include a developer's fee because the Fund did not incur a developer's charge.

### B. Conclusions of Law

1. The DoL submits that the Trustees' decision to finance, construct and lease to the Union space in the Administration Building was imprudent because:

(a) The office complex was grossly overbuilt to accomodate the Union; direct construction costs averaged $100 per square foot—one and one-half times to twice as much as a comparable, high-quality office building in the Fort Lauderdale area.

(b) The Pension Fund between 1979 and 1981 poured almost $2 million into the construction project, interest free; not a single dollar of the Pension Fund's interest or investment costs on the project was recouped from the Union, the principal tenant.

(c) The Union was significantly undercharged on its lease, paying only about 75% of what was required to enable the Pension Fund to recover its costs and earn a reasonable return; additionally, because of the excessiveness of the facility, Pension Fund space in the building

necessitates charges almost twice the amount of rents for comparable office facilities.

(d) The Pension Fund is earning an *annual* return of between 3% and 8% on its office building investment, without even considering lost interest amounts; this is substantially less than it could have earned on alternative, well-secured investments.

Plaintiff Secretary of Labor's Trial Brief at 2 (filed Jan. 16, 1985) (emphasis added).

2. The Department's charges are indeed serious, but its bark is worse than its bite. Try as it might to prove the veracity of its accusations—parading to the stand expert witnesses with their voluminous reports— the DoL simply was unable to prove its case by a preponderance of the evidence.

3. The DoL's difficulty stems from its perception of this case as much as its lack of persuasive evidence, though the two are in many respects intertwined. The issue to be resolved herein is *not* whether the construction and financing of or the lease arrangement for the Building are "prudent" based on what one now knows, but rather whether, knowing what the Trustees knew at the project's inception based on their investigation, it is reasonable for them to proceed as they did. *See American Communications Association v. Retirement Plan*, 488 F.Supp. 479, 483 (S.D.N.Y.), *aff'd*, 646 F.2d 559 (2d Cir.1980). ERISA § 404(a)(1)(B) requires only that the Trustees vigorously and independently investigate the wisdom of a contemplated investment; it matters not that the investment succeeds or fails,[21] as long as the investigation is "intensive and scrupulous and ... discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan." *Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir.1984); *supra* p. 7.

4. The case law gives meaning to the "prudence" standard. In *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983), for example, the appellate court ruled that the fiduciaries' decision to purchase stock for their plan in reliance upon a consultant's totally inaccurate appraisal of the stock's fair market value violated section 404(a)(1)(B). *Id.* at 1470 n. 30, 1470–71. The evidence showed that during the two years between the time of the appraisal and consummation of the transaction, the trustees failed to consider whether the facts and assumptions underlying the consultant's appraisal remained valid. *Id.* at 1469–70. Significantly, the Trustees in the instant case always worked with current information, and often hired independent consultants to verify the earlier work of other advisors.

5. The breaches of fiduciary duty recounted in *Katsaros v. Cody*, 744 F.2d 270 (2d Cir.1984), *Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), and *Davidson v. Cook*, 567 F.Supp. 225 (E.D.Va.1983), are even more egregious than those of the trustees in *Cunningham*, and serve to further define what constitutes imprudent behavior.

6. The trustees in *Katsaros* breached their fiduciary duty under ERISA § 404(a)(1)(B) when they approved a $2 million loan to a bank which they knew was destined to fail based on its financial condition, performance and credit-worthiness at the time of the transaction; and when they failed to collect the unreimbursed expenses incurred by the fund in connection with a second aborted loan. The trustees' handling of the $2 million loan was particularly imprudent, for they approved it without obtaining independent professional analysis of the bank's financial statements. Those records would have shown first, that the bank had never earned enough money to service the debt and probably would not be able to do so in the future, either; second, the bank was undercapitalized; and third, the bank was deeply in debt. 744 F.2d at 276. Moreover, several local banks, including the subject bank's principal creditor, refused to lend it money, and some of the

21. *See supra* note 14 and accompanying text.

collateral that was to secure the loan had been seized for back taxes while the remainder was worth some one-third less than the stated value. Little wonder that the court found that the trustees who were involved in this debacle had violated section 404(a)(1)(B).

7. The trustees in *Donovan v. Mazzola* also found themselves behind the eight ball for patently imprudent behavior. The focus in *Mazzola*, as in *Katsaros*, was the prudence of a $1.5 million pension fund loan to another fund secured by real estate. Of primary concern to the court was the trustees' retention and reliance upon the advice of a certain consultant whom they knew or should have known lacked expertise to analyze the value of the collateral. The evidence showed that the consultant had never made a feasibility study of or advised others about property of the sort in question; he failed to discuss the significance of his report with the trustees and did not submit an update when one was appropriate. An expert called by the DoL testified that the trustees conduct prior to making the loan fell far short of industry standards because they failed to ascertain the value of the property deeded by the debtor as security for the loan; they did not determine the extent to which the pension fund's interest in the collateral would be subordinate to other security interests; they neglected to discover that the debtor had previously been unable to make regular payments on previous loans from the fund; and they granted the loan below the prevailing interest rates for comparable mortgages at the time. 716 F.2d at 1232–33.

8. The Trustees in this case, in contrast with those in *Mazzola*, required their consultants to make timely reports and fre-quently discussed the content of expert reports at Board meetings. The DoL did not challenge the qualifications or competency of the Trustees' consultants to perform work for the Fund.

9. *Davidson v. Cook*, like *Katsaros* and *Mazzola*, describes imprudent fiduciary behavior. The union in *Davidson* sought to purchase some land on which to construct its headquarters, and accordingly incorporated a subsidiary to buy and develop the property and shield it from responsibility for the project's debts. When the subsidiary needed operating capital for the venture, the plan's trustees approved a $1 million loan secured by the land. On two later occasions, the subsidiary requested and received from the plan additional funds to complete the construction, bringing its total indebtedness up to $1.5 million. Incredibly, the trustees approved the original and two supplemental loans knowing full well that the fund's total assets were only $1.467 million. Thus, it was likely that the plan would have to borrow money itself to finance the subsidiary's loan! Not surprisingly, the court found that the trustees and fund administrator who had approved the loan arrangement had violated ERISA § 404(a)(1)(B).

10. The case law is replete with other examples of imprudent behavior by plan fiduciaries. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Marshall v. Glass/Metal Association and Glaziers and Glassworkers Pension Plan*, 507 F.Supp. 378 (D.Haw.1980); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis. 1979).[22] Two points are to be gleaned from

---

22. *Cf. Brink v. DaLesio*, 496 F.Supp. 1350 (D.Md. 1980), *aff'd in part and rev'd on other grounds*, 667 F.2d 420 (4th Cir.1981). When the union in *Brink* failed to find satisfactory new offices, a service provider purchased a building and then rented space therein to the union. The service provider sought a long-term lease, but the union would only settle for a short-term deal. Notwithstanding the duration of the lease, the union spent a substantial sum of money to renovate the offices so as to make them suitable for its needs. The union's effective rental was more than double what it was previously paying, and the evidence at trial showed that the rental amount was some 65% more than rents for comparable space. The district court held that the defendant trustee who negotiated the office rental breached his fiduciary duty under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C.A. § 501 (West

these decisions. First, the definition of "prudent" behavior is an evolving concept that is given meaning by the facts and circumstances of each case. Second, the Trustees in the instant matter did not breach their fiduciary duty to the Fund's participants and beneficiaries; the evidence documents their care and diligence in planning for the financing, construction and lease of the Administration Building:

(a) The Trustees continually sought the advice of their attorneys, retaining two law firms in addition to the Fund's General Counsel: one specializing in ERISA and another in real estate matters in South Florida.[23]

(b) The Trustees employed professional engineers to undertake core borings and obtained two expert appraisals before purchasing the property.

(c) The designer of and contractor for the Administration Building were chosen after competitive bidding.

(d) Prior to construction the Trustees obtained an updated cost estimate of the site, an independent review of its economic viability, an expert feasibility study of the Copans tract as a whole, together with an independent evaluation of that study and projections of the Fund's cash flow.

(e) An independent real estate investment manager negotiated the Union's lease with the Fund.

(f) The Trustees met frequently with and without their consultants to discuss the Building's progress.

(g) When the project appeared to be over-budget, the Trustees eliminated certain aspects or demanded new, cheaper designs.

11. In sum, the Trustees behavior in this case, unlike the palpably imprudent actions of the fiduciaries in *Cunningham, Mazzola, Katsaros* or *Davidson,* was reasonable under the circumstances. A more thorough analysis of the Department's allegations confirms this conclusion.

### 1. Costs

12. The Secretary maintains that the Fund "grossly overbuilt" the Administration Building by paying some $100 per square foot for its construction. The Department's claim rests entirely on the expert report of John Condon, whom the DoL retained to determine what a ready and willing owner would pay a qualified contractor to construct a building comparable to the Fund's Building in 1980–1981.

13. Mr. Condon's study does little to bolster the Department's case because of its faulty assumptions and glaring omissions. *See supra* ¶¶ 26–30 at pp. 21–22. The report is based on *Marshall's Valuation Service,* which Mr. Condon concedes is so general that he himself would not use it in making a competitive bid to construct the Administration Building. TR 369. Mr. Condon's figures are only estimates, and do not prove that a structure *comparable* to the Fund's Building could be constructed in 1980–1981 for the per square foot price reported in his study. Furthermore, Mr. Condon admits that had he taken into account those items which he had omitted to consider, the cost per square foot to construct the Administration Building would have been $72.98, TR 429–441, which is a far cry from $100/ft.$^2$ and perfectly reasonable by his own methodology. In point of fact, neither Mr. Condon nor the DoL proved that the Fund actually paid $100/ft.$^2$ to construct its Building, whereas the Trustees did establish that the Administration Building was to be constructed for

---

1975) (The LMRDA is a precursor to ERISA). 496 F.Supp. at 1366.

**23.** A trustee who lacks the education, experience and skill required to make a decision regarding the investment of a plan's assets has an affirmative duty to seek independent counsel in making the decision. The failure to do so is imprudent and constitutes a violation of ERISA

§ 404(a)(1)(B). *Donovan v. Bierwirth,* 680 F.2d 263, 272–73 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). The Trustees in this case complied with the *Bierwirth* rule by consistently retaining independent professionals to advise them on all material aspects of the Administration Building project. *But see supra* note 10.

approximately $70.93/ft.$^2$ under the construction contract with the Warner firm.[24]

14. The Condon study is also unhelpful because it does not recognize that the Trustees intended for the Administration Building to set the tone for the Business Park as a whole; a "high quality" structure was necessary to project a successful image, attract tenants and add value to the surrounding development. Due to these deficiencies, the Condon report is of little value to the court.

15. In short, the Department can show no credible evidence that the Administration Building is "overbuilt".

### 2. Financing

16. The DoL also cites as imprudent the Trustees' decision to finance the construction of the Administration Building with the Fund's own money. The Department has the burden of proving that a prudent Trustee acting under similar circumstances would have obtained a loan from a permanent lender to finance the construction project rather than use its own money. Here, too, the Department did not meet its burden.

17. Ralph Bowden, the DoL's real estate consultant, could not testify that the Fund's self-financing of the Building's construction was imprudent. Moreover, the Trustees own independent real estate manager, Denison Hall, opined that equity financing was not unusual and in fact made perfect sense in this case due to the Fund's substantial liquidity and the extremely high interest rates then prevailing on construction loans. By using its own money, the Fund also avoided a tax on income derived from debt-financed property, see 26 U.S.C.A. §§ 501(b), 511–514(c)(9)(B).

18. Based on Mr. Hall's testimony, and lacking any competent and persuasive evidence to the contrary offered by the Department, the court finds that the Trustees' decision to use its own money to finance

the construction of the Administration Building was prudent.

### 3. "Imputed Interest" and Developer's Fees as Part of Tenant's Rental

19. The court was initially intrigued by the Secretary's argument that the Trustees acted imprudently by not including in the Union's rent the anticipated income the Fund would have realized had it financed the construction of the Building with a loan and invested its own money in reasonably high yielding investments such as certificates of deposit or bonds. In a sense, the $1.8 million invested by the Fund in its Building represented "free money" to the Union. DoL Pretrial Stipulation ¶ 33 at 16 (filed Jan. 21, 1981). Likewise, the Fund's failure to include a pro rata share of the developer's fees in the Union's rent represented a break on the overall rental charge.

20. Although armed with a seemingly potent argument, the DoL was simply unable to prove its point. The record makes clear that the Trustees did not charge the Union for the Pension Fund's investment costs because the Fund used equity capital and not debt to finance the construction. By using its own money, the Fund incurred no interest charges and hence none were assessed against the Union in the form of higher rent. Similarly, the Trustees did not charge the Union for developer's fees because the Fund served as its own developer. The Trustees certainly could have included these "non-costs" in the Union's rent, but that would have been a discretionary judgment to be made by the Board based on the tenor of the lease negotiations.

21. The inability of the DoL's witnesses to address the debt-equity distinction, or even to opine that "imputed costs" and developer's fees are ordinarily passed along to tenants under similar circumstances, distinguishes this action from cases such as *Donovan v. Mazzola*, 716 F.2d at

---

**24.** In its direct examination of Dennis Walton, the DoL attempted to prove that the Building cost $81–82 per square foot to construct. TR 75. The Department was unsuccessful in establishing the accuracy of this figure and, even if true, is still substantially less than the $100 per square foot cost asserted by the DoL.

1232–34, and *Marshall v. Glass/Metal Association and Glaziers and Glassworkers Pension Fund*, 507 F.Supp. at 382, in which the Department was able to call expert witnesses who testified that the fiduciaries' actions did not comport with prevailing practices in the industry. *See also Brink v. DaLesio*, 486 F.Supp. at 1379.

22. The testimony at trial thus leaves one with the distinct impression that the notion of charging a tenant for costs not actually incurred by a landlord is a concept singularly subscribed to by the DoL. The Secretary would have the court establish a new rule embodying this idea rather than promulgate its own regulation on the subject. Just as the *Cunningham* court refused to "adopt" a Revenue Ruling on valuing closely-held stock for estate and gift tax purposes as a substitute for DoL regulations on pricing a controlling block of stock acquired by an employee stock option plan, 716 F.2d at 1472–73, so too does this court decline to consider the Secretary's self-proclaimed rule regarding "imputed interest" and developer's fees as the equivalent of a formal regulation.

23. To the extent that analogous legal concepts are helpful, the court notes that speculative costs of the sort challenged by the DoL herein are not ordinarily included in calculating damage awards in breach of contract actions, *see Center Chemical Co. v. Avril, Inc.*, 392 F.2d 289, 290–91 (5th Cir.1968) (relying on *Hodges v. Fries*, 34 Fla. 63, 15 So. 682, 684 (1894)). Likewise, the Internal Revenue Code does not require that theoretical costs be included in determining the "basis" for the profit to be taxed upon the sale of real estate. *See* 26 U.S.C.A. §§ 1001, 1011–1016, 1245, 1250–1252; Treas.Reg. §§ 1.1011–1.1016, 1.1245–1–1.1245–6, 1.1250–1(a)–1.1252–2(d)(4).

24. On balance, the Trustees did not act imprudently in failing to include in the Union's rent the costs of loan interest and developer's fees never incurred by the Fund.

### 4. The Fund's Return on Investment

25. The Secretary is particularly troubled by the Pension Fund's rate of return on its investment in the Administration Building. The Trustees' real estate advisor, Denison Hall, maintained from the start that in negotiating the Union's lease he sought to obtain for the Fund a current cash return of 10% *averaged* over a *five*-year period. Notwithstanding this goal, the Department has steadfastly argued that the Fund has actually realized a return of substantially less than 10% *per annum*. *See, e.g., supra* p. 25 (quoting DoL Trial Brief). The DoL is indeed correct, but the Trustees never set out to obtain a 10% cash-on-cash return per year. Therein lies the error in the Department's argument.

26. The more relevant inquiry is whether the Fund's 10% return over a five-year period is sufficient to be prudent under section 404(a)(1)(B). One must resist the knee-jerk reflex to pronounce an investment prudent or imprudent based on the success of the venture, for ERISA is concerned with the soundness of the decision to invest. *See supra* pp. 7, 26.

27. The evidence proves that the Trustees acted prudently in establishing the Union's rent. The Union's initial lease with the Fund was the product of tough negotiations between Denison Hall and Dennis Walton. While the Fund had to make concessions to snare the Union as a tenant (e.g., staggered rental), Mr. Hall refused to charge the Union an average rental of less than $16.53/ft.$^2$ over a period of five years. In his judgment, such a figure ensured an average return on equity of 10% during that period, and was sufficient to make the arrangement "beyond reproach". Donald Pierce, an expert property appraiser for the Fund, substantiated that view in his report, which states that the Union's rental was competitive in the then-existing marketplace.

28. The DoL's only rebuttal to this evidence is again the testimony of Ralph Bowden. The Department retained Mr. Bowden to determine if it was economically feasible to construct the Administration Building and charge an annual rental of $16.53/ft.$^2$ and still expect a 10% cash re-

turn on investment. Not surprisingly, he answered in the negative.

29. The court finds it necessary to substantially discount the value of Mr. Bowden's testimony because of several erroneous assumptions on his part. First, in reaching his conclusions he relied upon John Condon's figures, which told him little about the construction costs of the Fund's new building. Without a relatively precise comparable cost estimate, the very foundation of Mr. Bowden's economic feasibility analysis collapses. Second, he examined the Fund's return on capital on an annualized basis, while the Trustees were seeking an average return of 10% over a period of years. Third, Mr. Bowden assumed that the Fund incurred financing costs, a/k/a "imputed interest", in constructing the Building, which clearly it did not since the project was financed with Fund money.

30. In summary, the DoL was never able to demonstrate by a preponderance of the evidence that the Fund could not realize a 10% cash-on-cash return averaged over five years by charging the Union a rental of $16.53/ft.² More importantly, the Department was never able to demonstrate that the Fund's return on investment, be it 10% or less, was imprudent as measured by industry standards.

31. Interestingly, the DoL's own regulations suggest that the Trustees would have been prudent to have settled for an average return of less than 10%. Prohibited Transaction Exemptions (PTE) 76-1 and 77-10 both permit a fund to lease office space to a union if, *inter alia*, the fund receives a "reasonable compensation" for the space. "Reasonable compensation" is defined as not necessarily including a profit. Admittedly, this definition is reserved solely for PTE 76-1 and 77-10, but it at least suggests that conceptually the meaning of a "prudent" return on equity under ERISA is more flexible than the DoL would propose.

32. This view is confirmed by the DoL's seminal regulation relating to investments under the "prudence" rule. In its Preamble to Rules and Regulations for Fiduciary Responsibility, the Department explained that:

> ... an investment reasonably designed—as part of the portfolio—to further the purposes of the plan, and that is made upon appropriate consideration of the surrounding facts and circumstances, should not be deemed to be imprudent merely because the investment, standing alone, would have, for example, a relatively high degree of risk.

29 C.F.R. §§ 2550.404a–1–414, *reprinted in*, PENS.REP. (BNA) No. 245, R–1, R–3 (June 25, 1979) [hereinafter cited as Pens. Rep.]. The Department emphasized that "the prudence of an investment decision should not be judged without regard to the role that the proposed investment or investment course of action plays within the overall plan portfolio." *Id.* at R–1. It also stressed that the standard "should and does depart from traditional trust law" which required the courts to evaluate each investment alone. *Id.*

33. The DoL's Rules and Regulations for Fiduciary Responsibility are "interpretative" and not "legislative" in character,[25] Pens.Rep. at R–4, and represent the Department's opinion as to the meaning of the "prudence" rule and do not have the force of law. *See Haddon Township Board of Education v. New Jersey Department of Education*, 476 F.Supp. 681, 691 (D.N.J.1979). The value of this interpretative material thus hinges on whether its construction of ERISA is practical and consistent with the Act's central purposes. *See, e.g., Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 383 (5th Cir.), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1981).

34. The Department's interpretation of ERISA § 404(a)(1)(B) in its Rules and Reg-

---

25. A rule is "interpretative" rather than "legislative" if it is not issued pursuant to legislatively delegated power to make rules having the force of law or if the agency intends the rule to be no more than an expression of its construction of a statute or rule. *Chamber of Commerce of United States v. OSHA*, 636 F.2d 464, 468 (D.C.Cir. 1980).

ulations for Fiduciary Responsibility is entirely consistent with ERISA's legislative history and this decision, but is at odds with the DoL's position in this case. The construction of the Administration Building may indeed have been a somewhat risky venture given the economic climate prevailing in 1980–1981, but the evidence shows that the Trustees did virtually everything that a prudent person would have done to identify and minimize those risks. They hired independent consultants who performed several studies and whose work was updated and subjected to close scrutiny by Trustees and other consultants. In reviewing that information, they considered whether the Fund could afford the project; and whether the venture would provide an ample current return on the investment and enhance the value of the Fund's portfolio. The results of their efforts confirmed what the Trustees suspected all along: that the Copans development as a whole and the Administration Building in particular offered promising financial rewards.

35. If the Trustees' investigation and deliberation prior to constructing the Administration Building is not prudent as defined by the regulations, then virtually nothing they would have done would have been prudent in the DoL's view short of foregoing the project altogether. Arguably *that* view would be imprudent given the plethora of information available to the Trustees suggesting that the project was going to be a smashing success! In the final analysis, however, the central inquiry is whether the participants and beneficiaries interest in the Pension Fund was unreasonably jeopardized by the Trustees' decision to construct and finance the Administration Building and to lease space therein to the Union. The clear weight of the evidence indicates that the Trustees acted prudently thereby safeguarding the interests of the Fund's members.

\* \* \* \* \* \*

36. Upon review of all the salient facts, the inevitable conclusion is that the Trus-

tees did not breach their fiduciary duty under ERISA § 404(a)(1)(B).

### III. TRUSTEES' MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS UNDER ERISA §§ 404, 405 & 406

 The DoL originally charged the Trustees with violating ERISA §§ 404(a)(1)(A), (B), 405(a)(3), 406(a)(1)(B), (D) and 406(b)(2). The court denied cross-motions for summary judgment on all of these issues, *see supra* p. 2, and tried the question of section 404(a)(1)(B) liability separately. The court now revisits its previous order denying the defendants' motion for summary judgment on the remaining issues in the case. In undertaking this review, the court is mindful that a party seeking a summary judgment bears the burden of demonstrating that no genuine dispute exists as to any material fact in the case. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Clemons v. Dougherty County, Georgia*, 684 F.2d 1365 (11th Cir. 1982). In determining whether a movant has met this burden, the court must review the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608. All reasonable doubts about the facts are resolved in favor of the non-movant. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970).

#### A. Section 404(a)(1)(A)

 ERISA requires that trustees discharge their duties with respect to the pension plan "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing" them with benefits and defraying administrative expenses. 29 U.S.C.A. § 1104(a)(1)(A).[26] The DoL contends that the Trustees here violated that provision by negotiating a lease agreement that benefited the Union and did

**26.** *See supra* note 13.

not contain the "best terms" possible for the Fund. Memorandum of the Secretary of Labor in Support of Cross-Motion for Partial Summary Judgment at 10 (filed Jan. 17, 1985) [hereinafter cited as DoL Memorandum].

To be sure, the Union derives some benefit from its lease of office space from the Fund as well as the Fund's requirement that contractors engaged in construction work on the Copans project be party to collective bargaining agreements providing for pension fund participation. For example, the Union occupies a high quality facility; its office space expenditures benefit its members' pension fund rather than an unrelated party; its members have better job opportunities and increased prospects for pension benefits; and its proximity to the Fund allows it to share services and reduce expenses.

These benefits, however, are parallel to and inseparable from the benefits derived from the Fund and its participants. The Union, as the Administration Building's anchor tenant, provides the Pension Fund with a healthy return on its equity investment. The success of the Building undoubtedly contributes to the appreciation of the entire Copans tract and brings the Fund ever closer to completing its plan for development of the property.

■ Even without these benefits to the Fund, ERISA § 404(a)(1)(A) simply does not prohibit a party other than a plan's participants and beneficiaries from benefiting in some measure from a prudent transaction with the plan. Furthermore, by adopting the "exclusive purpose" standard, Congress did not intend to make illegal the fact of life that most often a transaction benefits both parties involved.

The case law supports this view. What courts frequently find objectionable is an imprudent plan transaction in which the trustee has a personal stake. For example, in *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), the appellate court held that plan trustees who also are officers of a takeover target and have sub-

stantial career and financial interests in the outcome of the control contest must resign as fiduciaries since it is "almost impossible" for them to use the plan assets in ways which would weaken their own position in the takeover bid. Likewise, the court in *Leigh v. Engle*, 727 F.2d 113 (7th Cir.1983), held that trustees who use fund assets to purchase stocks that are the targets of securities in the trustees' personal investment portfolio violate section 404(a)(1)(A).

■ In these cases and others, *e.g.*, *Donovan v. Daughtery*, 550 F.Supp. 390, 409 (S.D.Ala.1982); *Brink v. DaLesio*, 496 F.Supp. 1350, 1376–79 (D.Md.1980), *aff'd in part and rev'd on other grounds*, 667 F.2d 420 (4th Cir.1981), the trustees' judgment "could scarcely be unbiased", *Bierwirth*, 680 F.2d at 276, since the subject investments promised the fiduciaries personal profit at the possible or actual expense of the plan's participants and beneficiaries. Clearly this arrangement constitutes a violation of the "exclusive benefit" rule.

■ Other decisions acknowledge, however, that a trustee may make management decisions that incidentally benefit the plan or the trustees provided the judgment is prudent and primarily promotes the interest of plan participants and beneficiaries. *Morse v. Stanley*, 566 F.Supp. 1455 (S.D.N.Y.1983), *aff'd in part and rev'd on other grounds*, 732 F.2d 1139 (2d Cir.1984), is a case in point. In *Morse*, plan trustees who also served as members of the employer's senior management refused to accelerate payment to a departing employee from the employer's profit-sharing plan. Certainly, the decision benefited the plan *and* the company by leaving the fund reserve intact at the expense of a plan participant. But the court recognized that the trustees' decision also enlarged the rights of all participants by preventing the depletion of funds available for loyal employees. The court thus held that the trustees' decision to deny fund payment to the departing employee was not a violation of ERISA § 404(a)(1)(A), reasoning that "[i]t is no vio-

lation of a trustees' fiduciary duties to take a course of action which reasonably best promotes the interests of plan participants simply because it incidentally also benefits the corporation." 732 F.2d at 1146 (citing with approval *Donovan v. Bierwirth* ).

In the instant case, as in *Morse*, the Trustees' decisions were reasonably calculated at the time they were made to primarily benefit the Fund members. The Union and the Pension Fund admittedly benefited, too, but that is to be expected since a successful Copans project translates into more jobs and larger payments into the Fund. There is no evidence indicating that the Trustees and the Union were in collusion to deprive Fund members of their rightful benefits. There is also no evidence that at the time the Trustees made their decisions they intended to benefit the Union at the expense of the Fund members. In fact, the evidence is quite the contrary: the numerous consultants hired to advise and review the work of other consultants, the arms-length lease negotiations, and the willingness to eliminate certain planned construction in order to save money speaks strongly for the Trustees' concern first and foremost for the interest of the Fund's participants and beneficiaries.

The case law directs that a trustee's investment decisions "must be made with an eye single to the interests of the" plan members, *Bierwirth*, 680 F.2d at 271, but one's focal point must not be so small as to obscure one's true view of the picture. The DoL's position with respect to section 404(a)(1)(A) blurs the distinction between exclusive and incidental benefits and, therefore, is rejected by the court.

### B. Section 406

The DoL next argues that the Trustees violated section 406[27] by constructing the Administration Building with Fund participants and with the intention of housing the Union as an anchor tenant, and by leasing the Union space in the Building for less than "reasonable compensation". DoL Memorandum at 14. These contentions are either unfounded or the alleged improprie-

ties not unlawful. A look back at ERISA § 406 and the controlling law explains why.

■ The general guidelines governing a fiduciary's activities vis-à-vis a covered plan and its members contained in ERISA § 404(a) are qualified by the more specific rules of section 406. That provision provides in pertinent part that a fiduciary may not transfer or transact business with either a party in interest, 29 U.S.C.A. § 1106(a)(1)(B), (D), or a party whose interests are adverse to those of the plan or its participants and beneficiaries. *Id.* § 1106(b)(2). A "party in interest" includes, *inter alia,* a covered employer/employee organization, a fiduciary, or other person who provides services to a plan. *Id.* § 1002(14)(A)–(D). An "adverse party" is one whose interests conflict with those of the plan and its members. *See, e.g., Cutaiar v. Marshall,* 590 F.2d 523, 529–30 (3d Cir.1979); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 637–38 (W.D.Wis. 1979).

■ Congress passed the prohibitions of ERISA § 406 to prevent certain categories of transactions which offer a high potential for insider abuse of plans or for loss of plan assets. *Marshall v. Kelly,* 465 F.Supp. 341, 354 (W.D.Okl.1979); H.R. Conf.Rep. No. 1280, 93d Cong., 2d Sess. at 309, *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5089. Absent a statutory or administrative exemption, plan fiduciaries are forbidden to cause a fund to engage in specified deals regardless of whether any harm actually results from the transaction. *McDougall v. Donovan,* 552 F.Supp. 1206, 1215 (D.C.Ill.1982); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 637 (W.D.Wis.1979). Courts should interpret section 406 narrowly, in contrast to the sweeping requirements of prudence and loyalty contained in section 404. *Evans v. Bexley,* 750 F.2d 1498, 1500 n. 3 (11th Cir. 1985) (citing with approval *Donovan v. Bierwirth* ).

27. *See supra* note 15.

Faithful to these precepts, courts have consistently ruled that a fiduciary who permits a plan to transact business with an entity in which he has a personal interest, or which has an interest in the plan, violates ERISA § 406. *See Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984) (trustee owned stock in target company and used plan funds to assist target's management in takeover attempt); *M & R Investment Co. v. Fitzsimmons,* 685 F.2d 283 (9th Cir.1982) (loan transaction between plan and company whose parent owned third entity which was employer contributing to plan); *Donovan v. Daughtery,* 550 F.Supp. 390 (S.D. Ala.1982) (trustees authorized for each other monthly payments from fund's assets as compensation for their services as fiduciaries and authorized fund to make contributions on their behalf so as to make each other eligible for receipt of fund benefits); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979) (trustees permitted virtually all of fund's assets to be loaned back to company whose employees were participants in fund in exchange for unsecured promissory notes).

Likewise, when identical trustees of two employee benefit plans whose participants and beneficiaries are not identical effect a loan between the plans without a section 408 exemption, a *per se* violation of ERISA § 406(b)(2) occurs. *See Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Cutaiar v. Marshall,* 590 F.2d 523 (3d Cir.1979); *cf. Brink v. DaLesio,* 667 F.2d 420 (4th Cir.1981) (trustees received gratuities from party dealing with pension fund); *Davidson v. Cook,* 567 F.Supp. 225 (E.D.Va.1983) (trustees of fund who also served as directors of sponsoring union's subsidiary approved imprudent loan between fund and subsidiary).

By broadly construing section 406 and its descriptive law, the DoL would have this court outlaw the Pension Fund's arrangement with the Union to construct and lease the Administration Building. The legal issue raised by the Department's argument is significant, but one which the court need not address because there exist specific regulations which exempt the construction and leasing arrangement from the prohibitions of the federal labor laws.

Prohibited Transaction Exemptions (PTE) 76–1, 41 Fed.Reg. 12,740 (1976),[28] and 77–10, 42 Fed.Reg. 33,918 (1977),[29] permit plan trustees to lease office space or provide administrative services to a participating employee union without incurring liability under ERISA § 406(a) or § 406(b), respectively, provided *inter alia,* the plan receives "reasonable compensation" for the lease; the arrangement allows the plan to terminate the relationship on reasonably short notice; and the plan maintains such records as are necessary to enable the DoL to verify compliance with the regulations.

All three of these conditions are satisfied in this case. As established in Section II, the Union's rent is more than sufficient to reimburse the Fund for its costs; indeed, the Fund receives a 10% current return on equity averaged over five years. The subject lease permits the Fund to terminate the agreement on ninety days notice, a fact not disputed by the parties. Equally uncontested is the fact that the Fund keeps accurate, current and complete records of its lease arrangement.

The Secretary argues that neither PTE 76–1 nor 77–10 contemplate or approve a fund's lease of office space to a union in a building constructed with fund dollars, built by fund participants, and occupied in part by the union. He also suggests that the exemptions were promulgated solely to "grandfather in" space and cost-sharing arrangements between a plan and a union that existed before ERISA's enactment. DoL Memorandum at 15.

Certainly the Department's interpretation of its own regulation is entitled to "great deference", *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), provided its construc-

---

**28.** *See supra* note 16.

**29.** *See supra* note 17.

tion of ERISA does not thwart the Act's statutory mandate. *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1118 (10th Cir.1977). But the court must also consider the practical consequences of the Secretary's construction, *see New York State Commission on Cable Television v. FCC*, 571 F.2d 95, 98 (2d Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 85 (1978), and whether his interpretation is supported by the "plain meaning" of the regulations' words. *See Oliver v. United States*, 696 F.2d 1129, 1131 (5th Cir.1983).

After careful consideration of the Secretary's position, the court finds that it is neither supported by any credible evidence nor sustained by the plain language of the exemptions.

The exemptions speak in terms of a plan's "leasing" of office space to a union. No mention is made of how a plan is expected to acquire office space to lease in the first place, although the prefatory language in PTE 76-1 states that a multi-employer plan may "independently secure for its own use office space" and then "furnish part of such office space ... to a participating employee organization...." The operative word is "secure". It can mean "construct" just as surely as it can mean "purchase". Including "construction" in the definition of "secure" makes sense contextually and is internally consistent with the exemption and its underlying statute. PTE 77-10 expressly incorporates the reasoning of PTE 76-1 and, therefore, the interpretative logic of one applies to the other since the latter does not expressly preclude the construction given the former.

PTE 76-1 and 77-10 both appear to limit their application to those space and cost-sharing arrangements between a fund and a union existing before January 1, 1975. But the Department offers not a shred of evidence to prove that a fund's purchase and construction of a building and subsequent lease of space therein to a participating union was not "customary" in the industry at the time of ERISA's enactment. Quite the contrary, plaintiff's attorney acknowledged on at least one occasion that it is quite common for substantial financial entities to build their own offices and then lease out space.

The difficulty with the Department's position is that its arguments read into the exemptions expressions and meaning that are neither present nor reasonably supported by the accompanying language. Clearly "[a] regulation cannot be construed to mean what [the DoL] intended but did not express." *Usery*, 577 F.2d at 1119. The DoL certainly is welcome to promulgate a regulation prohibiting the Fund-Union arrangement reviewed herein,[30] but until it does so the Secretary should not expect the court to craft a prohibition lacking a reasonable basis and clear legislative guidance.

### C. Section 405

There are three essential elements for liability under ERISA § 405(a)(3): the occurrence of a breach; a fiduciary's knowledge that another individual was a fiduciary; and the co-fiduciary's participation in the act constituting the breach. *Brink v. DaLesio*, 496 F.Supp. 1350, 1383 (D.Md.1980), *aff'd in part and rev'd on other grounds*, 667 F.2d 420 (4th Cir.1981) (citing H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. at 299, *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5080). Since the preceding analysis establishes that the Trustees did not breach ERISA, there can be no violation of section 405(a)(3).

## IV. CONCLUSION

The decision in this case is as much due to the DoL's lack of proof as it is compelled by both logic and law. In summary, the court enters judgment for the defendant Trustees in all material respects:

1. After a trial on the merits, the court enters a judgment in favor of defendants

---

**30.** This invitation is not intended to constitute judicial approval of such a regulation. That

decision is reserved for an appropriate case.

and against plaintiff on the issue of liability under ERISA § 404(a)(1)(B).

2. Summary judgment is entered in favor of defendants and against plaintiff with respect to the issues of Trustees' liability under ERISA §§ 404(a)(1)(A), 405(a)(3), 406(a)(1)(B), (D) and 406(b)(2). The Department of Labor's cross-motion for summary judgment, previously denied, is again denied.

The court finds that the defendant Trustees did not breach their fiduciary duties to the Pension Fund and its participants and beneficiaries by constructing the Administration Building using contractors who contributed to the Fund, by financing the construction with its own money, and by leasing space in the Building to the Union.